# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**AMEKA RIDDICK, Administrator of the Estate of**
**PAMELA RENEE RIDDICK, THE DECEDENT, deceased**

       *Plaintiff,*

                                      **Case No.**

**V.**                                    **DEMAND FOR TRIAL BY JURY**

**WILLIAM WATSON,**
**Individually and as Sheriff for the City of Portsmouth,**

        **SERVE AT:  9 Ventnor View**
                        **Carrollton, VA 23314**

**K.S. LEAZER,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                        **Portsmouth, VA 23704**

**P. DEAVER,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                        **Portsmouth, VA 23704**

**V.M. WILLIAMS,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                        **Portsmouth, VA 23704**

**T. WEATHERS,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                        **Portsmouth, VA 23704**

**LT. R. COARDES,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                        **Portsmouth, VA 23704**

**SGT. C. L. KELLY,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**DARDEN,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**PERRY,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**M. QUINN,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**FERNANDEZ,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**E. WILSON,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**STONE,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**TAGLIS,**
**Individually and as a Deputy for the City of Portsmouth,**

      **SERVE AT: 701 Crawford Street**
                  **Portsmouth, VA 23704**

**LT. CASTES,**
**Individually and as a Lieutenant for the City of Portsmouth,**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**LT. CORTEZ**
**Individually and as Lieutenant for the City of Portsmouth**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**J.A. CASHWELL,**
**Individually and as Officer for the City of Portsmouth**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**C.M. SHAW,**
**Individually and as Officer for the City of Portsmouth**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**CORRECT CARE SOLUTIONS,**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**CLIFFORD ROSE, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

      **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**MICHELLE MURRAY, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

      **SERVE AT:  701 Crawford Street,**
                    **Portsmouth, VA 23704**

**K. MAYFIELD, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

      **SERVE AT:  701 Crawford Street,**
                    **Portsmouth, VA 23704**

      *Defendants.*

## COMPLAINT

*Now comes* the undersigned Plaintiff, by counsel, pursuant to Va. Code Ann § 8.01-50 et. seq., 42 U.S.C. § 1983, and Virginia statutory and common law, and moves for judgment against the defendants, jointly and severally, for the following:

## PARTIES

1.     At all relevant times, Plaintiff Ameka Riddick ("Plaintiff"), was a citizen and resident of the city of Portsmouth, Virginia.  Plaintiff is the daughter of the decedent, Pamela Renee Riddick ("the decedent"), and has qualified in Portsmouth Circuit Court as the administrator of her mother's estate.  Plaintiff brings this suit in her representative capacity on behalf of the decedent's children as statutory beneficiaries:  Natasha Riddick, Donnisha Riddick, Jasmine Riddick, and Ameka Riddick.

2.     At all relevant times, the decedent was in the custody and control of the Portsmouth City Jail, the Portsmouth Sheriff's Office, and various Deputies, Sergeants, Lieutenants, various nurses, and/or employees of Correct Care Solutions, all of whom were on duty at the time of her custody in the Portsmouth City Jail through the time of her death on August 23, 2017.

3.     At all relevant times, Defendant Sheriff William Watson ("Watson"), was employed as the Sheriff for the City of Portsmouth, responsible for the operation and maintenance of the Portsmouth City Jail where the decedent was incarcerated and died, and acted within the scope of his employment, agency, and servitude with the Sheriff's office.

4.     All of the following named deputies were sworn Sheriff's deputies who came in contact with the decedent during her incarceration at the Portsmouth City Jail, including but not limited to, Deputy J.A. CASHWELL, Deputy K.S. LEAZER, Deputy P. DEAVER, Deputy V.M. WILLIAMS, Deputy T. WEATHERS, Deputy DARDEN, Deputy PERRY, Deputy

4

QUINN, Deputy FERNANDEZ, Deputy WILSON, Deputy STONE, Deputy TAGLIS, Lieutenant CASTES, Lieutenant R. COARDES, Lieutenant CORTEZ, Deputy C.M. SHAW, and Sergeant C.L. KELLY, duly appointed and actively employed as sheriff's deputies, sergeants, and lieutenants and acted within the scope of their employment, agency, and servitude for the Portsmouth Sheriff's Office and under the authority of Defendant William Watson. The aforementioned deputies will be referred to collectively herein as the "on-duty guards."

5.     At all relevant times, Defendants CLIFFORD ROSE, MICHELLE MURRAY, and K. MAYFIELD were duly appointed and actively employed as nurses, licensed practitioners, or trained medical personnel, each acting within the scope of their employment, agency, and servitude for Correct Care Solutions. The aforementioned defendants will be referred to collectively herein as the "medical personnel."

6.     Defendant Correct Care Solutions is a Corporation company under the laws of the State of Tennessee and licensed to do business in the State of Virginia.

7.     Upon information and belief, Correct Care Solutions contracted with the Portsmouth Sheriff's Office to provide medical care to the Portsmouth City Jail.

8.     Defendant Watson and the Portsmouth Sheriff's Office are liable under state law for the acts and omissions of their deputies, sergeants, and lieutenants under the theory of *respondeat superior*. Watson had supervisory liability under the Virginia wrongful death statute § 8.01-50 and under 42 U.S.C. § 1983 due to their supervisory indifference or tacit authorization of their subordinates' misconduct.

9.     Correct Care Solutions is liable under state law for the acts and omissions of its staff under the theory of *respondent superior*.

10.    At all times, the defendants acted pursuant to and under the color of state law and pursuant to their authority as law enforcement personnel and medical personnel. Plaintiff sues

all defendants in both their individual and their official capacities.

11.     This claim is being brought pursuant to 42 U.S.C. § 1983, the Virginia Wrongful Death Statute, Va. Code §8.01-50 et. seq., and Virginia common and statutory law. The allegations and factual contentions contained herein are likely to have further evidentiary support after a reasonable opportunity for further investigation or discovery.

## FACTUAL BACKGROUND

12.     On or about August 21, 2017, at approximately 4:30 p.m., the decedent was booked into the Portsmouth Jail by Officer J.A. Cashwell.  Decedent presented with clear and obvious signs that she was suffering from severe symptoms of heroin withdrawal.  The decedent advised Cashwell that she snorted heroin and used 3-4 caps every day, and acknowledged a history of withdrawal symptoms which included cramping, vomiting, and diarrhea.  At approximately 6:58 p.m., decedent's booking was complete and she was transferred into the general jail population.

13.     Upon information and belief, Defendant Cashwell was the booking officer who was one of the first to come into contact with the decedent, and either deliberately or negligently ignored the obvious symptoms of opioid withdrawal the decedent was suffering at the time she was booked into the jail.  Defendant Cashwell failed to either observe and notify the medical staff or other deputies, or properly document decedent's symptoms and health concerns in the first instance.  Defendant Cashwell and every named defendant herein ignored the information learned from the observing and speaking with the decedent.

14.     Decedent advised Defendant Cashwell and medical staff that she needed medical attention immediately.  Ignoring this information, the decedent was booked into jail without any medical attention or communication to the deputies regarding monitoring the decedent's condition.

15.     On August 22, 2017, Defendant Michelle Murray, a licensed practical nurse, examined and/or evaluated the decedent.  Defendant Murray documented that the decedent had "no current medical treatment needed," completely ignoring the information provided at booking that she had a serious opioid heroin addiction and that she continued to suffer from withdrawal symptoms.

16.     All of the aforementioned events and information should have raised immediate concerns before placing the decedent in the general jail population without first being examined by a licensed medical physician, being placed in a medical facility, being placed in a treating hospital as the circumstances may have warranted, and/or being placed in a holding cell for close observation.

17.     In the decedent's medical screening, the decedent reported she was a daily heroin user, used 3-4 caps every day, and had a medical history of withdrawal symptoms to include cramps, diarrhea, and vomiting.

18.     All of this information was ignored by all named defendants.  Specifically, Defendants K. Mayfield and R. Coardes, who were present at the decedent's medical intake on August 21, 2017, and who were aware that the decedent had an active heroin addiction while demonstrating clear and obvious symptoms of opioid withdrawal, completely ignored the information known to them.

19.     Upon information and belief, all this information was known, or through the exercise of reasonable care, should have been known to the named defendants when decedent was booked and processed into the Portsmouth City Jail.  The decedent was in the care and custody of the Portsmouth Sheriff's Office and its agents, and Defendant Correct Care Solutions and its agents, from booking until the time of her death.  Defendants knew, or in the exercise of reasonable care should have known, that the decedent was in acute distress from heroin

7

withdrawal and/or another life-threatening medical condition requiring immediate medical intervention, from the time of her booking up to her death on August 23, 2017.

20.     Upon information and belief, the decedent told the named defendants that she was suffering from withdrawal as a result of her heroin use and requested medical treatment for her withdrawal symptoms.  This request was either ignored or refused by the defendants.

21.     Despite the decedent's quickly debilitating physical symptoms, she was placed in a cell with video surveillance of the hallways which showed that on August 23, 2017, at 3:18 a.m., a white female deputy walked past the decedent's cell.  Upon information and belief, this female deputy was Deputy K.S. Leazer.  At 3:34 a.m., another white female deputy walked the post, barely glancing into the decedent's cell.  Neither of those defendants paid any attention to the decedent despite her failing medical condition.

22.     Despite the Portsmouth Sheriff's Office's explicit written policy requiring that deputies walk the post two times per hour, the record shows that no one walked past the decedent's cell until 4:58 a.m., leaving the decedent to languish without proper medical care that could have saved her life.

23.     Throughout the one hour and twenty-four minutes during which no deputy walked the post, the decedent writhed and agonized in pain in her cell.  At 4:54 a.m., the record shows decedent's attempt to get assistance from the defendants by waiving her arms and hands through the cell bars to get the attention of defendants or medical staff so that she could receive lifesaving medical treatment for her heroin withdrawal symptoms, which were then worsening.

24.     An unidentifiable white female walked past the decedent's cell at 5:03 a.m., paying no real attention to the decedent, despite her obvious pleas for help.

25.     At 5:14 a.m., the record shows that the decedent again placed her hands on the bars pleading for help to no avail.

26.     A white female brought food trays for the cells at 5:16 a.m.  The decedent fails to even touch her food tray or attempt to eat despite having been incarcerated since 4:30 p.m. on August 21st.

27.     At 5:23 a.m. and 5:25 a.m., the decedent places her hands on and outside the bars again.  At 5:31 a.m. and 5:32 a.m., the decedent places her hands on and outside the bars, near the bottom of the cell, clearly indicating now that she was on the floor and unable to stand, demonstrative of her quickly declining and serious medical condition.  No defendant so much as inquired with the decedent about her then existing medical condition despite numerous opportunities to intervene.

28.     At 5:34 a.m., a white female deputy is seen at the cell removing the decedent's food tray.  Before taking the untouched tray, this deputy reaches her arm and hand into the decedent's cell removes the tray, and walks away.  It appears that this deputy failed to check on the physical wellbeing of the decedent despite the aforementioned evidence that decedent was in immediate need of assistance.   The same female deputy walked by again at 5:36 a.m.; this time paying no attention to the decedent whatsoever.

29.     At 5:44 a.m., a white male deputy appeared at the doorway, looked into the decedent's cell, ignored all of decedent's attempts to gain their attention, and did nothing.  The record shows him talking on a radio and opening the adjacent cell to escort a white female inmate, believed to be Leslie Neuman, from her cell.  Upon information and belief, this white male deputy is Sergeant C.L. Kelly.  Kelly offers no assistance to the decedent at the time.

30.     At 5:46 a.m., a white female deputy entered decedent's cell.  Upon information and belief, the white female deputy is Deputy Wilson.  Sergeant Kelly then enters the cell.  This appears to be the first time that any named defendant recognizes that the decedent is non-responsive, despite her earlier and numerous demonstrative attempts to notify the named

defendants of her need for immediate medical attention.

31.    Inmate Neuman was placed back into the cell.  At 5:47 a.m. on August 23, 2017, more than thirty-seven (37) hours after her booking, the defendants for the first time, begin to assess, evaluate, and render medical treatment to the decedent for her deteriorating medical condition.  The defendants acknowledged for the first time, at 5:48 a.m., that a life and death situation was occurring.

32.    A male deputy thereafter arrives with a medical kit.  Upon information and belief, the personnel who responded to the emergency were Lieutenant Coardes, Deputy Wilson, Deputy Quinn, Deputy Deaver, Deputy Weathers, and Nurse Rose.  Additional personnel may be identified throughout the course of discovery.

33.    Until 5:47 a.m., the named defendants failed to diagnose and handle a life-threatening medical condition that the decedent was suffering from the moment she was processed into the jail.  It is contended that each of the named defendants either deliberately ignored or negligently failed to provide the decedent with the proper medical care that she needed in the first instance.

34.    The aforementioned timeline shows that despite the decedent's pleas and those of other inmates (both known and unknown to the undersigned), to both on-duty sheriff's deputies as well as employees and agents of Defendant Correct Care Solutions about the decedent's quickly deteriorating medical condition, the defendants jointly ignored the decedent's complaints for more than 12 hours, leaving the decedent helpless to her life threatening illness.

35.    Upon information and belief, each of the named defendants came into contact with the decedent at some critical point in time during the decedent's processing and incarceration, a time that it is contended that each should have known by either looking at or listening to the decedent that she was in desperate need of medical assistance.  In addition to the

10

defendants named in paragraphs 12 through 41, upon information and belief, Defendants Shaw, Williams, Darden, Fernandez, and Stone were on duty at the time during which the decedent was in the custody of the Portsmouth City Jail and came into contact with the decedent at least once during that time. Each of the named defendants, who came into contact with the decedent, ignored either negligently or deliberately these facts, thereby denying decedent of medical assistance at a time when it could have saved her life.

36.     Defendant R. Coardes was in a supervisory role as the on-duty lieutenant and in a supervisory role at the time the decedent was an inmate in the Portsmouth City Jail. As a supervisor, Lieutenant Coardes has a duty to ensure that all of the deputies under his supervision were trained to properly identify and appropriately handle the medical conditions of incarcerated inmates, particularly conditions involving heroin and opioid addiction and their associated withdrawal symptoms, especially in a jail with a history of incarcerating similarly-situated individuals. Lieutenant Coardes failed in these duties for reasons set forth herein, and so recognized this fact by describing the scene he came upon as a "crime scene."

37.     No medical attention was sought nor requested for the decedent until approximately 5:45 a.m. on August 23, 2017, when Defendant Clifford Rose was called to render emergency medical assistance to decedent. At that time, upon information and belief, the decedent was not conscious nor breathing on her own, nor at any point in time thereafter. Plaintiff contends that the decedent had died in the jail cell before any medical assistance was requested or rendered.

38.     At all times relevant herein, no employee of the Sheriff's Department nor of Defendant Correct Care Solutions ever entered decedent's cell to check on her before she died.

39.     This is not the first heroin/opioid withdrawal death that has occurred within the Portsmouth City Jail. Upon information and belief, Kendra Nelson was processed as an inmate

in the Portsmouth City Jail on July 27, 2016, and died upon similar facts and circumstances as made subject matter of this Complaint. The named defendants were therefore on notice of the failings of the patterns and practices within the facility.

40.     Upon information and belief, Stephen Goff, an investigator for the Board of Corrections, was hired by the state to conduct a review of jail deaths, which included the death of decedent, Pamela Renee Riddick. That investigation found the jail logs to be falsified to make it appear as though Portsmouth sheriff's deputies were making their proper checks and rounds on the decedent, as required by the written policy of the Sheriff's Office. Goff found that the Portsmouth Sheriff's Office, under then duly-elected Sheriff William Watson, violated its own written policy in its deputies failing to make the required checks and rounds instituted for the benefit and welfare of the inmates, which included the decedent.

41.     An autopsy performed by licensed Medical Examiner, Dr. Michael Hays, on August 23, 2017, found that the decedent had the presence of opioids, cocaine, benzoylecgonine, cocaine, and fentanyl in her blood, and determined that the ultimate cause of death being fentanyl toxicity, a known ingredient of heroin.

### COUNT I: WRONGFUL DEATH ON-DUTY GUARDS' NEGLIGENCE

42.     Paragraphs 1 through 41 are incorporated by reference herein.

43.     At all relevant times, the on-duty guards were engaged in the duties of law enforcement and operation of the jail and had a duty to exercise reasonable care in their treatment of the decedent.

44.     That each of the named defendants herein, through their acts and/or omissions as set out herein, violated either public policy and procedures, or the Sheriff's Office written policy and procedures in place to ensure the health and well-being of its inmates while incarcerated.

45.     At all relevant times, on-duty guards should have known that the decedent was in

extreme distress because of her medical condition and should have taken steps to ensure proper treatment of the decedent.

46.   Notwithstanding their duties, the defendants;

a)   Negligently failed to take steps to alleviate the decedent's suffering due to her medical condition which was apparent, or should have been apparent through the exercise of reasonable care to the defendants and employees;

b)   Negligently failed to monitor the decedent's life-threatening medical symptoms while in the defendants' sole and exclusive custody;

c)   Negligently failed to walk their post at least two times per hour as required by the General Post Orders Procedure in the Portsmouth Jail's Policies and Provisions;

d)   Negligently responded and/or failed to respond to the decedent's repeated requests and pleas for medical attention to alleviate her heroin withdrawal symptoms and any other medical condition from which she was suffering;

e)   Negligently failed to take all reasonable and necessary acts to prevent the decedent's death;

f)   Negligently failed to identify, diagnose, and treat a life-threatening condition which then existed at the time of booking, and failed to properly address and monitor that condition thereafter; and

g)   Negligently failed to house the decedent in a proper medical cell for around the clock monitoring, or to transport the decedent to a licensed medical hospital, both of which were available at the time the decedent was in the defendants' custody.

47.   That the acts and/or omissions as set out herein as to the on-duty guards were

undertaken in the course of their employment with the Sheriff for the City of Portsmouth, and that said acts and/or omissions are hereby imputed to the named Defendant William Waston, Sheriff for City of Portsmouth and the Portsmouth Sheriff's Office.

48.    As a direct and proximate result of the sheriff's personnels' and/or its agents' omissions and negligence, the decedent died on August 23, 2017.

49.    As a further direct and proximate result of the negligence and gross disregard for her condition, defendants, jointly and severally, caused the decedent to suffer grave anxiety, physical suffering, severe mental anguish and pain, inconvenience, and death.

## COUNT II: ON-DUTY GUARDS' GROSS NEGLIGENCE

50.    Paragraphs 1 through 49 are incorporated by reference herein.

51.    The conduct of the on-duty guards, as set out above, was grossly negligent, willful, and reckless in that the guards were aware that the decedent was suffering a life-threatening condition and recklessly failed to attend to the decedent's well-being.  The on-duty guards acted in a grossly negligent fashion by not rendering and/or seeking appropriate medical treatment, by allowing the decedent to remain in pain, and by failing to take any steps required to have prevented the decedent's death.

52.    That the acts and/or omissions as set out herein as to the on-duty guards were undertaken in the course of their employment with the Sheriff for the City of Portsmouth, and that said acts and/or omissions are hereby imputed to the named Defendant, William Waston, Sheriff for City of Portsmouth and the Portsmouth Sheriff's Office.

53.    That as to each of the named defendants herein, through their acts and/or omissions as set out herein, violated either public policy and procedures, or the Sheriff's Office written policy and procedures created to ensure the well health and well-being of its inmates while incarcerated.

54.     The on-duty guards' conduct was clearly in reckless disregard of the rights of the decedent and was designed purely to inflict discomfort, humiliation, embarrassment, and harm to the decedent.

55.     That the falsification of the jail log records in this instance constitutes in, and of itself, an act of deliberate indifference and/or gross negligence, warranting the relief requested.

56.     As a direct and proximate result of defendants' gross negligence, the decedent died on August 23, 2017.

57.     As a further direct and proximate result of the defendants' gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

## COUNT III: ON-DUTY GUARDS' § 1983 VIOLATIONS- DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

58.     Paragraphs 1 through 57 are incorporated by reference herein.

59.     At the time of the incident giving rise to litigation, the on-duty guards were acting in their individual capacities, as employees of the Portsmouth Sheriff's Office, and under the color of state law.

60.     The conduct of the on-duty guards, as set out above, shows their deliberate indifference to the decedent's basic needs during her confinement.  The guards failed to offer basic medical treatment necessary to prevent the decedent's severe pain, agony, and death.  The defendants' conduct offends the standards of basic human decency and violates the Eighth Amendment's restriction on cruel and unusual punishment.

61.     That the acts and/or omissions as set out herein as to the on-duty guards were committed in the course of their employment with the Sheriff for the City of Portsmouth, and that said acts and/or omissions are hereby imputed to the named Defendant, William Watson.

62.     As a direct and proximate result of defendants' deliberate indifference to a serious

15

medical need, the decedent died on August 23, 2017.

63.    As a further direct and proximate result of the on-duty guards' gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

## COUNT IV: WILLIAM WATSON'S NEGLIGENCE

64.    Paragraphs 1 through 63 are incorporated by reference herein.

65.    At all relevant times, Watson, individually and through his employees, agents and servants, including on-duty guards, was acting under the color of state law in operating the Portsmouth City Jail and had a duty to exercise reasonable care in handling inmates incarcerated at his facility, including the decedent.

66.    At all relevant times, Watson had a duty to train and supervise his employees, agents, and servants of the Sheriff's Office, including the on-duty guards and medical personnel, to ensure that they were fit and able to deal with situations that may arise during the course of their employment with the Sheriff's Office such as providing proper medical care and monitoring inmates with severe illness.  Watson knew, or should have known, that inmates who are experiencing severe physical and mental anguish are particularly prone to death.

67.    At all relevant times, Watson, individually and through his employees, agents, and servants, including on-duty guards and medical personnel, knew or should have known that the decedent was experiencing severe physical and mental medical distress and needed proper medical attention and monitoring to prevent death.  Watson, individually and through his employees, agents, and servants, had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly or recklessly failed or refused to do so.

68.    Notwithstanding his duties, Watson individually and through his employees,

16

agents, and servants, including on-duty guard defendants;

    a)  Negligently, and with deliberate indifference, failed to provide medical care to the decedent while she was in custody at the jail;

    b)  Negligently failed to provide sufficient death monitoring at the jail;

    c)  Negligently failed to adequately instruct, control, discipline, train and supervise the on-duty guards, medical personnel, and staff, on a continuous basis, on the proper policy and procedure for treating and monitoring inmates who are suffering drug withdrawal symptoms and are at risk of death, especially in providing proper death monitoring;

    d)  Directly or indirectly approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of his employees, agents, and servants, including the on-duty guard defendants; and

    e)  Was otherwise negligent, depriving the decedent of her rights, privileges, and immunities secured by the United States Constitution and the laws of the United States.

69.    As a direct and proximate result of Watson's negligence, the decedent died on August 23, 2017.

70.    As a further direct and proximate result of Watson's negligence, the decedent was caused to suffer grave anxiety, severe physical suffering and mental anguish, substantial pain and suffering, inconvenience, and death.

71.    At all relevant times, Sheriff Watson acted within the scope of his employment, in servitude to the Portsmouth Sheriff's Office.

## COUNT V: WILLIAM WATSON'S GROSS NEGLIGENCE

72.    Paragraphs 1 through 71 are incorporated by reference herein.

73.     Watson's conduct, as set out above, was grossly negligent, willful and reckless, in that he, through his employees, agents, and servants, including the on-duty guards and medical personnel, intentionally ignored evidence that the decedent was experiencing severe medical distress and was at increased risk of death as a result of her physical condition.  Despite the readily available resources to provide medical treatment for the decedent, Watson, through his employees, agents, and servants, including the on-duty guard and medical personnel, acted in a grossly negligent manner by failing to expend the minimal amount of effort necessary to avoid the wrongs inflicted on the decedent.

74.     Watson's conduct and statements, through his employees, agents, and servants, including the on-duty guards and medical personnel, clearly show a reckless disregard of the rights of the decedent, a system-wide disregard for the rights of its inmates, and were designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

75.     That the falsification of the jail log records in this instance constitutes in, and of itself, an act of deliberate indifference and/or gross negligence, warranting the relief requested.

76.     As a direct and proximate result of Watson's gross negligence, the decedent died on August 23, 2017.

77.     As a further direct and proximate result of Watson's gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

78.     At all relevant times, Sheriff Watson acted within the scope of his employment, in servitude to the Portsmouth Sherriff's Office

## COUNT VI: WILLIAM WATSON'S § 1983 VIOLATIONS- POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

79.     Paragraphs 1 through 78 are incorporated by reference herein.

80.     At all relevant times, Sheriff Watson had a non-delegable duty to oversee the

18

treatment of inmates at the Portsmouth City Jail and to ensure that the constitutional rights of inmates were not violated.

81.     At all relevant times, Sheriff Watson had a non-delegable duty to oversee members of the Portsmouth Sheriff's Office and contractors working in the Portsmouth City Jail.

82.     Upon information and belief, Sheriff Watson was in charge of assigning or overseeing the assignment of contracts for medical treatment within the jail.

83.     That the falsification of the jail log records in this instance constitutes in, and of itself, an act of deliberate indifference and/or gross negligence, warranting the relief requested.

84.     Sheriff Watson knew or should have known that contractor Correct Care Solutions had a history of failing to uphold minimal constitutional care standards for inmates.

85.     Upon information and belief, the Sheriff and his supervisors either knew or through the exercise of reasonable care should have known, of a heroin/opioid epidemic which was then occurring particularly with inmates being processed into detention facilities within the Commonwealth of Virginia.  In furtherance, this information was well known to law enforcement and correctional personnel through public dissemination of the problem's magnitude;

    a) In March of 2008, Laquan Norman died of a cerebral hemorrhage while incarcerated in the Norfolk City Jail.  At the time of his death, Correct Care Solutions had a contract to provide medical services to the jail.  Upon information and belief, Correct Care Solutions and its employees failed to provide adequate medical treatment to Mr. Norman resulting in his death;

    b) On August 2, 2008, Valorie Burris died of a brain hemorrhage while in custody at the Alexandria City Adult Detention Center.  At the time of her death, Correct Care Solutions had a contract to provide medical services to the

jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms, including tremors, dehydration, heroin withdrawal symptoms, and loss of consciousness.  Correct Care Solutions's negligence in the treatment of Ms. Burris was the proximate cause of her death;

c) On August 2, 2014, Erin Jenkins died of a perforated duodenal ulcer while in custody at the Richmond City Justice Center. At the time of her death, Correct Care Solutions had a contract to provide medical services to the jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms including dehydration, confusion, hallucinations, and extreme weight loss.  Correct Care Solutions's negligence in the treatment of Ms. Jenkins was the proximate cause of her death;

d) On February 9, 2015, Shannon Crane died of hypertensive cardiomyopathy while in custody at the Riverside Regional Jail in Prince George, Virginia.  At the time of his death, Correct Care Solutions had a contract to provide medical services to the jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms including hypoxia.  Correct Care Solutions's negligence in the treatment of Mr. Crane was the proximate cause of her death; and

e) On July 28, 2016, Kendra Nelson died of fibrinous pericarditis with pericardial effusion at the Portsmouth City Jail—the same jail at issue.  At the time of Ms. Nelson's death, Correct Care Solutions had a contract to provide medical services to the jail.  Once again, Correct Care Solutions ignored Kendra Nelson's serious medical symptoms, including hypoxia, until it was

too late to reverse the damage.

86.     The aforementioned examples are just some of the many examples of Correct Care Solution's negligence and gross disregard of the inmates for which they were responsible. Defendant Watson and his employees, agents, and servants knew, or, should have known about the numerous constitutional violations of inmates by Correct Care Solutions. Defendant Watson, as sheriff for the City of Portsmouth, knew or should have known the actions alleged were bound to occur, and should have taken steps to prevent such outcomes.

87.     Defendant Watson and his employees, agents, and servants had the power to prevent and/or aid in preventing the actions described herein and, could have done so by exercising reasonable diligence, but intentionally, knowingly, and/or recklessly failed or refused to do so.

88.     Defendant Watson, in servitude to the Portsmouth Sheriff's Office, was aware of the alarming number of constitutional violations by contractor Correct Care Solutions. Despite this knowledge, the defendants failed to implement any policies, training, and/or remedial measures to prevent continuing violations by Correct Care Solutions. Such callous disregard for the constitutional rights of inmates constitutes a policy or custom of deliberate indifference to the serious medical needs of inmates.

89.     The Plaintiff believes the allegations described herein will likely have further evidentiary support after a reasonable opportunity to conduct discovery.

## COUNT VII: MEDICAL PERSONNELS' NEGLIGENCE

90.     Paragraphs 1 through 89 are incorporated by reference herein.

91.     At all relevant times, the medical staff personnel had a duty of reasonable care in their treatment of the decedent.

92.     At all relevant times, the medical staff personnel should have known that the

21

decedent was in extreme distress because of her acute medical emergency and should have taken steps to treat the decedent's medical condition.

93.     Notwithstanding their duties, the medical staff personnel;

a)  Negligently failed to identify and take all  necessary steps to treat the decedent's suffering from detoxification of heroin use and alleviate decedent's suffering due to her withdrawal symptoms and/or pericarditis;

b)  Negligently failed to monitor the decedent due to the increased risk of death by an individual experiencing extreme symptoms from severe medical distress;

c)  Negligently failed to respond to the decedent's reports that she was suffering severe withdrawal symptoms;

d)  Failed to administer additional necessary medical treatment which would have prevented the death of the decedent;

e)  Failed to request that the decedent be examined by a licensed medical doctor before she was released into the general jail population;

f)  Failed to refer the decedent to an appropriate medical facility unit within the jail which was then available to her;

g)  Negligently failed to identify, diagnose, and treat a life-threatening condition, which then existed at the time of booking, and failed to properly address and monitor that condition thereafter; and

h)  Negligently failed to house the decedent in a proper medical cell for around the clock monitoring, which was then available to the decedent.

94.     As a direct and proximate result of the Medical Staff Defendant's negligence, the decedent died on August 23, 2017.

95.     Each of the acts and omissions of the named Medical Staff Defendants were committed within the course of their employment with Defendant, Correct Care Solutions, and thereby the said acts or omissions are imputed to the named Defendant, Correct Care Solutions.

96.     As a further direct and proximate result of the negligence of the defendant medical personnel, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, inconvenience, and death.

97.     The Plaintiff certifies that, pursuant to Virginia Code § 8.01-50.1, she has obtained a written certification from a qualified expert that the Medical Personnel Defendants and Correct Care Solution's actions deviated from the applicable standard of care and that said deviation was the proximate cause of the death of the decedent.

## COUNT VIII:  THE MEDICAL PERSONNELS' GROSS NEGLIGENCE

98.     Paragraphs 1 through 97 are incorporated by reference herein.

99.     The conduct of the medical staff personnel, as set out above, was grossly negligent, willful and reckless, in that they knew that the decedent was suffering extreme effects from heroin withdrawal and/or other serious medical conditions and took no steps to alleviate her suffering.  The medical personnel acted in a grossly negligent fashion by failing to provide necessary medical treatment, by allowing the decedent to remain in pain, and by failing to take any steps to prevent the decedent's death.

100.    The medical personnel's conduct was clearly in reckless disregard of the rights of the decedent and was designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

101.    ~~As a direct and proximate result of defendants' gross negligence, the decedent~~ died on August 23, 2017.

102.    As a further direct and proximate result of the medical staff personnel defendants'

gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

## COUNT IX- MEDICAL PERSONNELS' § 1983 VIOLATIONS- DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

103.   Paragraphs 1 through 102 are incorporated by reference herein.

104.   At the time of the incident giving rise to litigation, the medical personnel were acting in their individual capacities and as agents of Sheriff Watson and the Portsmouth Sheriff's Office, and acted under the color of state law.

105.   The conduct of the medical personnel, as set out above, shows their deliberate indifference to the decedent's basic needs during her confinement.  The defendants failed to offer basic medical treatment necessary to prevent the decedent's severe pain, agony, and death.  The conduct of the defendants offends the standards of basic human decency and violates the Eighth Amendment's restriction on cruel and unusual punishment.

106.   As a direct and proximate result of defendants' deliberate indifference to a serious medical need, the decedent died on August 23, 2017.

107.   As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

## COUNT X: CORRECT CARE SOLUTIONS'S NEGLIGENCE

108.   Paragraphs 1 through 107 are incorporated by reference herein.

109.   At all relevant times, Correct Care Solutions, individually and through its employees, agents and servants was engaged in the medical treatment of inmates and had a duty to act with reasonable care in its treatment of the decedent.

110.   At all relevant times, Correct Care Solutions, individually and through its employees, agents, and servants, had a further duty to establish and enforce policies and

procedures to avoid its medical staff personnel's violation of a prisoner's constitutional rights such as the right to due process under the Fifth and Fourteenth Amendment and the right against cruel and unusual punishment prescribed by the Eight Amendment.

111.    At all relevant times, Correct Care Solutions had a  duty to train and supervise the employees, agents, and servants, including the medical personnel, and establish policies and procedure to be followed for the treatment, supervision, and death monitoring of an inmate, such as the decedent, suffering severe physical symptoms due to drug withdrawal.

112.    Correct Care Solutions breached this duty by failing to provide the decedent with medical treatment for her symptoms, by failing to provide sufficient death monitoring, and by exhibiting a callous indifference to her deteriorating state.

113.    As a direct and proximate result of Correct Care Solutions's negligence, the decedent died on August 23, 2017.

114.    As a further direct and proximate result of Correct Care Solutions's negligence the decedent was caused to suffer grave anxiety, severe physical suffering and mental anguish, substantial pain and suffering, inconvenience, and death.

## COUNT X: CORRECT CARE SOLUTIONS'S GROSS NEGLIGENCE

115.    Paragraphs 1 through 114 are incorporated by reference herein.

116.    Correct Care Solutions's conduct, as set out above, was grossly negligent, willful and reckless, in that it, through its employees, agents, and servants, the Medical Personnel Defendants, Correct Care Solutions intentionally failed to take any steps to alleviate the decedent's suffering, to provide any medical treatment, and to provide sufficient death monitoring.

117.    Correct Care Solutions's conduct was in reckless disregard of the rights of the decedent.  Its actions were designed purely to inflict discomfort, humiliation, embarrassment,

and other harm to the decedent.

118.    Correct Care Solutions otherwise acted with gross negligence, depriving the decedent of her rights, privileges, and immunities secured by the United States Constitution or laws of the United States.

119.    As a direct and proximate result of Correct Care Solutions's gross negligence, the decedent died on August 23, 2017.

120.    As a further direct and proximate result of Correct Care Solutions's gross negligence, the decedent was caused to suffer grave anxiety, extreme mental and physical anguish, severe pain, inconvenience, and death.

## COUNT XI: PUNITIVE DAMAGES

121.    Paragraphs 1 through 120 are incorporated by reference herein.

122.    At all relevant times, the defendants acted with actual malice toward the decedent.

123.    Defendants further acted consciously in an unjustifiable, willful, wanton, and reckless disregard of the decedent's rights.  Defendants were aware of their conduct and were also aware from their knowledge of existing circumstances and conditions that their conduct would likely result in physical, mental, financial, emotional injury and death to the decedent.

124.    That the defendants either knew, or through the exercise of reasonable care, should have known with the death of Kendra Nelson occurring on July 28, 2016 due to the jail's negligence, that said jail personnel should be properly trained to identify and to appropriately handle medical conditions of incarcerated inmates, particularly conditions involving heroin/opioid addicted individuals, and that their failure in this instance warrants an aware of punitive damages.

125.    The falsification of the jail log records in this instance constitutes in, and of itself, an act of deliberate indifference and/or gross negligence, warranting the relief requested.

126.   As further direct and proximate result of the defendants' acts and omissions, the

PLAINTIFF is entitled to punitive damages under Virginia law.

WHEREFORE, the undersigned plaintiff, by counsel, demands judgment against the

defendants, jointly and severally, for compensatory damages in the amount of **FIVE MILLION**

**DOLLARS ($5,000,000.00)**, and punitive damages in the amount of **TEN MILLION**

**DOLLARS ($10,000,000.00)**, plus all costs and interest as permitted by law.


**AMEKA RIDDICK, Administrator of the Estate of**
**PAMELA RENEE RIDDICK, THE DECEDENT, deceased**


By _____ /s/ _____
                                                    Of Counsel


Edward A. Fiorella, Jr., Esquire (VSB # 26176)
Katherine M. Lennon, Esquire (VSB # 92358)
*Fraim & Fiorella, P.C.*
Town Point Center, Suite 601
150 Boush Street
Norfolk, VA 23510
(757) 227-5900
(757) 227-5901 (fax)
efiorella@ff-legal.com
klennon@ff-legal.com
*Counsel of Record for the Plaintiff*

Don Scott (VSB # 88725)
Don Scott Law
355 Crawford Street
Portsmouth, Virginia 23704
(757) 673-0001
(757) 673-0952 (fax)
DScott@donscottfirm.com
*Counsel of Record for the Plaintiff*