UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

AMEKA RIDDICK, Administrator of
the Estate of PAMELA RENEE RIDDICK,
the Decedent, deceased,

     Plaintiff,

v.             Civil No. 2:19cv363

WILLIAM WATSON, et al.,

     Defendants.


<u>OPINION AND ORDER</u>

This case arises from the death of Pamela Renee Riddick (the "Decedent") on August 23, 2017, while in the custody of the Portsmouth City Jail ("PCJ"). The Decedent's daughter and administrator of her estate, Ameka Riddick ("Plaintiff"), initiated this action against multiple jail officials and affiliated medical staff, asserting claims under 42 U.S.C. § 1983 and the Virginia Wrongful Death Act. In three separate motions, all but one of the defendants move to dismiss Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). ECF Nos. 34, 42, 49. After reviewing the parties' briefs, the Court finds that a hearing on the motions is unnecessary. Therefore, Defendants' requests for such hearing is **DENIED**. ECF Nos. 36, 57, 58. For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** each of the pending motions to dismiss.

## I. FACTUAL BACKGROUND

When considering a Rule 12(b)(6) motion to dismiss, a district court must accept as true all of the factual allegations contained in the complaint.  Erickson v. Pardus, 551 U.S. 89, 94 (2007). Plaintiff alleges the following facts.  At approximately 4:30 p.m. on August 21, 2017, Deputy J.A. Cashwell booked the Decedent into PCJ.  ECF No. 2 ¶ 12.  During intake, the Decedent advised Deputy Cashwell that she "snorted heroin and used 3-4 caps every day" and had a history of severe withdrawal symptoms, including cramping, vomiting, and diarrhea.  Id.  Although the Decedent presented with such symptoms and requested medical attention at that time, Deputy Cashwell "failed to either observe and notify the medical staff or other deputies, or properly document [the] decedent's symptoms and health concerns in the first instance."  Id. ¶¶ 12-14.  The Complaint alleges that Lieutenant R. Coardes and K. Mayfield—a licensed practical nurse employed by Defendant Correct Care Solutions ("CCS")[1]—were also present during intake but likewise took no action in response to the Decedent's statements or condition.  Id. ¶¶ 4-5, 18.  After processing, PCJ officials placed the Decedent in the general jail population without "close observation."  Id. ¶¶ 12, 14, 16.

---

[1] At all relevant times, CCS served as PCJ's independent medical services provider.  ECF No. 2 ¶ 7.

The following day, August 22, 2017, Michelle Murray, a licensed practical nurse employed by CCS, "examined and/or evaluated" the Decedent. Id. ¶¶ 5, 15. The Decedent again reported that she used heroin daily and was suffering from symptoms of withdrawal, but Murray noted that "no current medical treatment [was] needed" and returned the Decedent to the general jail population. Id. ¶¶ 15-16.

In the early hours of August 23, 2017, video surveillance of the hallway outside the Decedent's cell reveals that a white female deputy, believed to be Deputy K.S. Leazer, passed by the Decedent's cell at 3:18 a.m. Id. ¶ 21. At 3:34 a.m., another white female guard, who is not named, patrolled the hallway and "barely glanc[ed] into the decedent's cell." Id. Although the Portsmouth Sheriff's Office maintains a written policy requiring deputies to "walk the post two times per hour," the footage does not show any person walking past the Decedent's cell again until 4:58 a.m. Id. ¶ 22.

According to the Complaint, during this one-hour-and-twenty-four-minute-long period in which no deputy traversed the hallway, "the decedent writhed and agonized in pain in her cell" due to symptoms of heroin withdrawal. Id. ¶ 23. At 4:54 a.m., the Decedent can be seen waving her arms through the cell bars to secure medical assistance, but none came. Id. ¶ 23. Another unidentified white female passed by the Decedent's cell at 5:03

3

a.m., but she "pa[id] no real attention" to the Decedent.   Id.
¶ 24.   The Decedent placed her hands on the cell bars at 5:14 a.m.,
again "pleading for help to no avail."   Id. ¶ 25.

At 5:16 a.m., a white female brought food trays to the cells.
Id. ¶ 26.   But the Decedent did not eat.   Id.   She again placed
her hands on the cell bars at 5:23 a.m. and 5:25 a.m.   Id. ¶ 27.
When she repeated this at 5:31 a.m. and 5:32 a.m., the placement
of her hands near the bottom of the bars indicate that "she was on
the floor and unable to stand."   Id.   Minutes later, a white female
deputy removed the Decedent's food tray from her cell, but the
deputy did not enter the cell or otherwise inspect the Decedent's
condition.   Id. ¶ 28.   The same deputy passed by the Decedent's
cell at 5:36 a.m. but "pa[id] no attention" to the Decedent.   Id.

The footage then shows that at 5:44 a.m. a white male deputy,
identified in the Complaint as Sergeant C.L. Kelly, looks into the
Decedent's cell without entering.   Id. ¶ 29.   Sergeant Kelly can
then be seen using his radio before opening the adjacent cell to
escort another female inmate from her cell.   Id.   Two minutes
later, a white female deputy, believed to be Deputy Wilson, enters
the Decedent's cell and realizes that the Decedent is non-
responsive.   Id. ¶ 30.   Shortly thereafter, Lieutenant Coardes,
Deputy Quinn, Deputy P. Deaver, Deputy T. Weathers, and CCS-
employed licensed practical nurse Clifford Rose arrived at the

4

Decedent's cell.[2]   Id. ¶¶ 4-5, 32.   Nurse Rose began rendering medical treatment, but efforts to revive the Decedent were unsuccessful. Id. ¶¶ 37, 41. An autopsy identified the cause of death as fentanyl toxicity. Id. ¶ 41. According to the Complaint, fentanyl is a known ingredient of heroin. Id. In addition, the Decedent's blood revealed the presence of opioids, cocaine, and benzoylecgonine. Id.

Sometime after the Decedent's death, Stephen Goff, a Board of Corrections investigator, conducted a review of PCJ inmate deaths, including the Decedent's. Id. ¶ 40. Goff's report concluded that PCJ officials falsified jail logs "to make it appear as though Portsmouth sheriff's deputies were making their proper checks and rounds on the decedent, as required by Sheriff's Office policy." Id.

On July 18, 2019, Plaintiff filed suit against PCJ officials Cashwell, Coardes, Deaver, Kelly, Leazer, Shaw, and Wilson (the "on-duty guards")[3]; then-Sheriff William Watson; CCS Nurses Mayfield, Murray, and Rose (the "CCS nurses"); and CCS. ECF No. 2. The Complaint, which names "all defendants in both their individual and their official capacities," id. ¶ 10, alleges

---

[2] Other deputies that did not respond to the cell but were on-duty and came into contact with Decedent at some point during her incarceration at PCJ include Defendant C.M. Shaw. Id. ¶¶ 4, 35.

[3] Although Plaintiff initially named additional PCJ officials, she has since voluntarily dismissed all claims against such officials. See ECF Nos. 31, 171.

twelve counts.  Counts I, IV, VII, and X[4] allege simple negligence against the on-duty guards, Sheriff Watson, the CCS nurses, and CCS.  Id. ¶¶ 42-49, 64-71, 90-97, 108-14.  Counts II, V, VIII, and XI allege gross negligence against the on-duty guards; Sheriff Watson; the CCS nurses; and CCS.  Id. ¶¶ 50-57, 72-78, 98-102, 115-20.  Counts III, VI, and IX allege various claims pursuant to 42 U.S.C. § 1983 against the on-duty guards, Sheriff Watson, and the CCS nurses, each in their official and individual capacities. Id. ¶¶ 58-63, 79-89, 103-07.  Finally, Count XII asserts that Defendants' conduct amounted to willful and wanton negligence, giving rise to punitive damages under Virginia law.[5]  Id. ¶¶ 121-26.  Plaintiff demands $5,000,000 in compensatory damages and $10,000,000 in punitive damages.  Id. at 27.

On December 5, 2019, Defendants Cashwell, Coardes, Deaver, Kelly, Shaw, and Watson (collectively, the "Cashwell Defendants") filed a joint motion to dismiss.  ECF No. 34.  In their motion (the "Cashwell Motion") and accompanying memorandum, ECF No. 35, the Cashwell Defendants argue that: (1) Plaintiff's § 1983 official capacity claims are barred by the Eleventh Amendment of the United States Constitution; (2) Plaintiff's individual

---

[4]  The Complaint includes two distinct counts that are each styled "Count X."  Herein, the Court refers to the second of these as "Count XI" and refers to the claim styled "Count XI" as "Count XII."

[5] Plaintiff's demand for punitive damages arises solely under Virginia law. See ECF No. 2 ¶ 126.

capacity § 1983 deliberate indifference claims are insufficient under Federal Rule of Civil Procedure 8; (3) Plaintiff's simple negligence claims are barred by state sovereign immunity; (4) Plaintiff's gross negligence and willful and wanton negligence claims are inadequate under Rule 8; and (5) Plaintiff's damages requests exceed the amounts permitted by Virginia law. On December 16, 2019, Defendant Wilson individually filed a motion to dismiss (the "Wilson Motion") and supporting memorandum, asserting arguments that largely mirror those asserted by the Cashwell Defendants. ECF Nos. 49, 50. Given this similarity, the Court will consider the Cashwell Motion and the Wilson Motion together.[6]

On December 16, 2019, Defendants CCS, Mayfield, Murray, and Rose (collectively, the "CCS Defendants") filed a joint motion to dismiss. ECF No. 42. Their motion (the "CCS Motion") and supporting memorandum, ECF No. 43, likewise argues that the Complaint fails to state sufficient facts to establish claims for § 1983 deliberate indifference, simple negligence, gross negligence, and willful and wanton negligence. Additionally, the CCS Defendants have submitted affidavits sworn by the CCS nurses and Paul Bell, a CCS registered nurse and the Health Services Administrator at PCJ. ECF No. 43-1 to -4. These affidavits attach the Decedent's "Booking Report" and "Inmate Medical Screening"

---

[6] The only remaining PCJ defendant, Deputy Leazer, has elected to pursue summary judgment. ECF No. 117. The instant Order and Opinion does not address that motion.

7

questionnaire, each of which is dated August 21, 2017; a "Refusal of Treatment" form signed by Nurse Mayfield and Lieutenant Coardes and dated August 21, 2017; a "Medical Information Transfer Form" e-signed by Nurse Murray and dated August 22, 2017; and Nurse Rose's August 23, 2017 progress notes recounting the efforts to revive the Decedent.

Plaintiff has filed responses to each motion, ECF Nos. 60, 65, 66,[7] and Defendants have filed replies, ECF Nos. 61, 68, 70. The motions are thus ripe for review.

## II. STANDARD OF REVIEW

The well-established Rule 12(b)(6) standard of review requires the dismissal of a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action,

---

[7] Plaintiff initially filed a response to the CCS Motion on December 30, 2019, ECF No. 64, before submitting a corrected response the following day, ECF No. 66. The two responses are identical except that the December 31, 2019 response includes an additional page displaying Plaintiff's attorney's signature. For purposes of this Opinion and Order, the Court considers the response filed on December 31, 2019, ECF No. 66.

supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012) (citation omitted). Although the truth of well-pleaded facts is presumed, a court is not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  "Additionally, while it is generally not appropriate to consider the viability of affirmative defenses at the Rule 12(b)(6) stage, in 'relatively rare circumstances' where all of the facts 'necessary to the affirmative defense clearly appear on the face of the complaint,' an affirmative defense . . . may be resolved on a motion to dismiss." Waites v. Wells Fargo Bank, N.A., No. 2:15cv353, 2016

WL 659084, at *2 (E.D. Va. Feb. 16, 2016) (quoting <u>Goodman v.</u>
<u>Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007)).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in
conjunction with Federal Rule of Civil Procedure 8(a)(2).   Rule
8(a)(2) requires only "a short and plain statement of the claim
showing that the pleader is entitled to relief," Fed. R. Civ. P.
8(a)(2), so as to "give the defendant fair notice of what the . . .
claim is and the grounds upon which it rests," <u>Twombly</u>, 550 U.S.
at 555 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).   Fair
notice is provided by setting forth enough facts for the complaint
to be "plausible on its face" and "raise a right to relief above
the speculative level on the assumption that all the allegations
in the complaint are true (even if doubtful in fact)."   <u>Id.</u>
(internal citations omitted).

Ordinarily, the Court may not rely on "matters outside the
pleadings" at the Rule 12(b)(6) stage without converting the motion
to dismiss into a motion for summary judgment.   Fed. R. Civ. P.
12(d); <u>see also</u> <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159,
165-66 (4th Cir. 2016) (stating that the court's evaluation of a
Rule 12(b)(6) motion to dismiss is "generally limited to a review
of the allegations of the complaint itself").   However, the Court
may consider documents attached to the complaint, Fed. R. Civ. P.
10(c), and documents submitted by the party moving to dismiss if
such documents are integral to the complaint and their authenticity

is undisputed, <u>Goines</u>, 822 F.3d at 166.  Additionally, the Court may take judicial notice of matters of public record.  See <u>Hall v. Virginia</u>, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

### III. DISCUSSION

### A. Section 1983 Claims

The Court begins by addressing Defendants' various arguments contending that the Court should dismiss Plaintiff's § 1983 claims.  Section 1983 provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Importantly, § 1983 "is not 'a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.'" <u>Lambert v. Williams</u>, 223 F.3d 257, 260 (4th Cir. 2000) (quoting <u>Baker v. McCollan</u>, 443 U.S. 137, 144 (1979)).

Here, Plaintiff alleges that the on-duty guards and CCS nurses, acting in their official and individual capacities, displayed deliberate indifference with respect to the Decedent's serious medical need in violation of the United States Constitution's Eighth Amendment's prohibition on cruel and unusual punishment.  ECF No. 2 ¶¶ 10, 58-63.  Plaintiff further argues

11

that such deliberate indifference reflects an official policy or custom of the Portsmouth Sheriff's Office, supporting a claim for municipal liability under § 1983.  Id. ¶¶ 79-89; see ECF No. 60, at 10-11.  In addition, Plaintiff seeks to hold Sheriff Watson liable in his individual capacity for the on-duty guards' acts and omissions pursuant to the doctrine of respondeat superior.  ECF No. 2 ¶¶ 8, 61.  Finally, Plaintiff also appears to assert claims against Sheriff Watson and Lieutenant Coardes in their individual capacities under a theory of supervisory liability.  Id. ¶¶ 8, 36, 79-89.

## 1. Official Capacity Claims

### a. Sheriff Watson and the On-Duty Guards

Sheriff Watson and the on-duty guards first argue that any § 1983 claims asserted against them in their official capacities are barred by the Eleventh Amendment of the United States Constitution.[8]  The Court agrees.

---

[8] The Fourth Circuit has yet to decide "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)."  Andrews v. Daw, 201 F.3d 521, 525 n.2 (4th Cir. 2000). Several courts in this circuit, however, have noted a "trend" of viewing Eleventh Amendment immunity through the lens of Rule 12(b)(1).  E.g., Clowdis v. Silverman, No. 3:15cv128, 2019 WL 1415454, at *12 (E.D. Va. Mar. 28, 2019); Darling v. Falls, 236 F. Supp. 3d 914, 925 n.11 (M.D.N.C. 2017); cf. Roach v. W. Va. Reg'l Jail & Corr. Facility Auth., 74 F.3d 46, 48 (4th Cir. 1996) ("Although not a true limit on the subject-matter jurisdiction of the federal courts, the Eleventh Amendment is 'a block on the exercise of that jurisdiction.'" (quoting Biggs v. Meadows, 66 F.3d 56, 60 (4th Cir. 1995))). This distinction, however, "makes little practical difference" as in either case the court must assume the truth of the facts alleged in the complaint and view them in the light most favorable to the plaintiff.  Zemedagegehu v. Arthur, No. 1:15cv57, 2015 WL 1930539, at *3 (E.D. Va. Apr. 28, 2015);

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Notwithstanding the express language of the Eleventh Amendment referencing "another State" and a "Foreign State," because "it would be 'anomalous' to allow a state to be sued by its own citizens in federal court when it cannot be sued by citizens of other states or nations," Erwin Chemerinsky, Federal Jurisdiction § 7.4, at 449 (7th ed. 2016) (quoting Hans v. Louisiana, 134 U.S. 1, 10 (1890)), "it is well established that 'an unconsenting State is immune from suits brought in federal courts by her own citizens,'" Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001) (quoting Edelman v. Jordan, 415 U.S. 651, 663 (1974)); see also Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011) (stating that the Eleventh Amendment "confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"). Such a suit may be maintained only when a state has waived its sovereign immunity or

---

accord Fleming v. Va. State Univ., No. 3:15cv268, 2016 WL 927186, at *1 n.4 (E.D. Va. Mar. 4, 2016).

Congress has expressly abrogated that immunity pursuant to the Fourteenth Amendment.[9]  Stewart, 563 U.S. at 253-54, 254 n.2.

Importantly, "Eleventh Amendment immunity does not extend to mere political subdivisions of a State such as counties or municipalities." Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002).  But it does attach to "governmental entities that are considered 'arms of the State.'" Will v. Migh. Dep't of State Police, 491 U.S. 58, 70 (1989).  This includes state officers acting in their official capacities.  See Kitchen, 286 F.3d at 183-84 ("The Eleventh Amendment limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities." (footnote omitted)); see also Will, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." (citation omitted)).

The Virginia Supreme Court has held that a Virginia sheriff "is an independent public official whose authority is derived from the Constitution of Virginia." Doud v. Commonwealth, 282 Va. 317, 321-22, 717 S.E.2d 124, 126 (2011) (quoting Carraway v. Hill, 265

_____

[9] Eleventh Amendment immunity is applicable in cases seeking money damages, but it does not bar a suit against state officials that seeks only "injunctive relief to prevent a continuing violation of federal law." Green v. Mansour, 474 U.S. 64, 68 (1985) (citing Ex parte Young, 209 U.S. 123, 155-56, 159 (1908)).

Va. 20, 24, 574 S.E.2d 274, 276 (2003)); see also Va. Const. art. VII, § 4 ("There shall be elected by the qualified voters of each county and city . . . a sheriff."). Thus, although sheriffs and other constitutional officers "may perform certain functions in conjunction with units of county or municipal government, neither the officers nor their offices are agencies of such governmental units." Doud, 282 Va. at 321, 717 S.E.2d at 126 (quoting Carraway, 265 Va. at 24, 574 S.E.2d at 276).

Recognizing the language of the Virginia Constitution and the decisions of the Virginia Supreme Court, this Court and the United States District Court for the Western District of Virginia have consistently held, and the Fourth Circuit has agreed, that Virginia sheriffs and their deputies are state officers afforded Eleventh Amendment immunity with respect to § 1983 official capacity claims. See, e.g., Star v. Chapman, No. 1:18cv1047, 2018 WL 10498017, at *1 (E.D. Va. Oct. 29, 2018) ("Plaintiff's [§ 1983] claims for monetary damages from Sheriff Chapman in his official capacity are barred by Eleventh Amendment sovereign immunity."); Burns v. Cook, No. 6:18cv73, 2018 WL 4935457, at *1 (W.D. Va. Oct. 11, 2018) ("In Virginia an action against a sheriff in his official capacity has been held to be an action against the state for the purpose of this immunity."); Vollette v. Watson, 937 F. Supp. 2d 706, 714-15, 715 n.7 (E.D. Va. 2013) (stating that a "Virginia Sheriff, as an arm of the State, is not subject to official

15

capacity Section 1983 monetary liability," and noting that with respect to such claims Virginia has not waived, nor has Congress abrogated, its sovereign immunity); Gemaehlich v. Johnson, No. 7:12cv263, 2013 WL 589234, at *4 (W.D. Va. Feb. 14, 2013) ("There is considerable authority holding that the Eleventh Amendment precludes § 1983 official-capacity suits against Virginia Sheriffs and their deputies because they are state, not local, officials."); see also Bland v. Roberts, 730 F.3d 368, 391 (4th Cir. 2013) ("[T]o the extent that the claims seek monetary relief against the Sheriff in his official capacity, the district court correctly ruled that the Sheriff is entitled to Eleventh Amendment immunity."); Smith v. McCarthy, 349 F. App'x 851, 858 n.11 (4th Cir. 2009) (unpublished per curiam) ("[T]he district court did not err in dismissing the [plaintiffs'] claims against [deputy sheriffs] in their official capacities, as they are afforded immunity by the Eleventh Amendment.").

Despite this overwhelming authority, Plaintiff asserts that the Eleventh Amendment poses no barrier to her official capacity claims, citing Jenkins v. Woody, No. 3:15cv355, 2017 WL 342062 (E.D. Va. Jan. 21, 2017). ECF No. 60, at 4-5. In Jenkins, another judge of this Court considered a Virginia sheriff's motion for summary judgment in a § 1983 action asserting, inter alia, claims against the sheriff in his official capacity, but rather than disposing of the claims on Eleventh Amendment immunity grounds,

the Court assessed their merits, granting in part and denying in part the motion. See 2017 WL 342062, at *10-11. Importantly, however, it does not appear that the sheriff ever raised the issue of Eleventh Amendment immunity. And "unlike subject matter jurisdiction, which federal courts must evaluate independent of the parties' contentions," whether to raise Eleventh Amendment immunity sua sponte is discretionary. Biggs, 66 F.3d at 60 (citing Patsy v. Bd. of Regents, 457 U.S. 496, 515 n.19 (1982)); see also Constantine v. Rectors of George Mason Univ., 411 F.3d 474, 481 & n.3 (4th Cir. 2005); Suarez Corp. Indus. v. McGraw, 125 F.3d 222, 227 (4th Cir. 1997). Here, in contrast, Sheriff Watson and his subordinates have asserted the defense, and the foregoing authority clearly supports their position—Virginia sheriffs and their deputies enjoy Eleventh Amendment immunity from § 1983 claims seeking money damages arising from acts taken in their official capacities. As such, Plaintiff's § 1983 official capacity claims against Sheriff Watson and the on-duty guards are **DISMISSED**.[10]

_____

[10] To be sure, this dismissal includes Plaintiff's "policy or custom" claim against Sheriff Watson in his official capacity. As an initial matter, "whether a public employer has adopted an unconstitutional 'custom' or 'policy' is a question to be asked when examining the basis for municipal liability under § 1983," Mikkelsen v. DeWitt, 141 F. App'x 88, 90-91 (4th Cir. 2005) (unpublished per curiam). And while municipalities and other local government units are considered "persons" under § 1983 and thus can shoulder liability for constitutional injuries inflicted by the execution of their official policies or customs, Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978), Virginia sheriffs, as established above, "are constitutional officers, not municipal officers," Cadmus v. Williamson, No. 5:15cv45, 2016 WL 1047087, at *5 (W.D. Va. Mar. 10, 2016) (emphasis added);

### b. The CCS Defendants

Plaintiff also asserts § 1983 official capacity claims against the CCS nurses. See ECF No. 2 ¶ 10. Although courts differ in their treatment of official capacity claims against individuals employed by private companies that contract with jails and prisons to provide inmate medical services, most treat such claims as claims against the private employer rather than against some government office or agency for which the privately-employed individuals provide services. See, e.g., Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 504 (1st Cir. 2011) (stating that official capacity claims against privately-employed nurses are

---

see also Sherman v. City of Richmond, 543 F. Supp. 447, 449 (E.D. Va. 1982) (noting that Virginia sheriffs serve "independent of municipal or county government"). As such, they are "arm[s] of the State, Lloyd v. Morgan, No. 4:14cv107, 2015 WL 1288346, at *5 (E.D. Va. Mar. 20, 2015) (adopting report and recommendation), and are thus protected by Eleventh Amendment immunity. See Cadmus, 2016 WL 1047087, at *12 (dismissing municipal liability § 1983 claim where the relevant allegations "involve[d] actions taken solely by [the sheriff] and his deputies"); see also Cadmus v. Williamson, No. 5:15cv45, 2016 WL 929279, at *25 (W.D. Va. Feb. 1, 2016) (dubbing the "label of 'municipal liability'" a "misnomer" where the complaint did "not name[] a municipal defendant"). The Court notes that Sherriff Watson did not raise this argument in briefing with respect to this specific claim, electing instead to defend on the ground that the Complaint failed to assert facts demonstrating the existence of an unconstitutional policy or custom. See ECF No. 35, at 9-11; ECF No. 61, at 3-4. Nonetheless, as the foregoing analysis makes clear: (1) the Eleventh Amendment precludes such claim; and (2) this Court has authority to consider Eleventh Amendment immunity sua sponte. See McGraw, 125 F.3d at 227 ("[B]ecause of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even sua sponte."). That being said, Eleventh Amendment immunity does not extend to claims against a state official in his or her individual capacity under a theory of supervisory liability, based on such supervisor's "indifference or tacit authorization of a subordinate's misconduct." Pratt-Miller v. Arthur, 701 F. App'x 191, 193 (4th Cir. 2017) (unpublished per curiam) (citing Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). The Complaint in this case appears to allege that Sheriff Watson is liable under such a theory, ECF No. 2 ¶ 8, and the Court will evaluate the sufficiency of those allegations below.

"tantamount" to claims against the private medical contractor);
Woodruff v. Ridings, No. 4:19cv56, 2019 WL 4126072, at *2 (W.D.
Ky. Aug. 29, 2019) ("[T]he Court construes Plaintiff's official-
capacity claim against Nurse Ridings as brought against her
employer, Southern Health Partners."); Miller v. Jones, No.
6:19cv6083, 2019 WL 4252821, at *2 (W.D. Ark. Aug. 7, 2019)
(dismissing official capacity claims against CCS employees because
the complaint "failed to identify any custom or policy of Correct
Care Solutions" (emphasis added)); Frey v. Reams, No. 1:17cv669,
2018 WL 582400, at *5 (D. Colo. Jan. 29, 2018) (stating that an
official capacity claim against a doctor employed by CCS "is the
equivalent of a claim against [CCS]"); Bingham v. Baker, No.
15cv11740, 2016 WL 8711599, at *4 (N.D. Ill. Apr. 15, 2016)
(stating that official capacity claims against two CCS employees
"are essentially claims against Correct Care Solutions"). But
see, e.g., Millward v. Bd. of Cnty. Comm'rs, No. 17cv117, 2018 WL
9371573, at *7-8 (D. Wyo. Oct. 19, 2018) (dismissing official
capacity claims against CCS nurses as "duplicative of the § 1983
official-capacity claims against Sheriff Whalen and Teton
County"). This Court need not decide the proper treatment of such
claims here because the official capacity claims against the CCS
nurses fail in either case.

If the official capacity claims are deemed claims against
Sheriff Watson's office, see ECF No. 2 ¶ 7 (stating that CCS

19

contracted with the Portsmouth Sheriff's Office to provide medical care to PCJ inmates), such claims are barred by the Eleventh Amendment for reasons already discussed.  On the other hand, if the claims are appropriately characterized as claims against CCS, the Complaint fails to properly allege an unconstitutional policy or custom.

It is well settled that a private entity may, in certain cases, act under color of law within the meaning of § 1983 and therefore be exposed to liability.  See Conner v. Donnelly, 42 F.3d 220, 223-24 (4th Cir. 1994).  The Fourth Circuit has observed that one way in which a private entity acts under color of law is when it "exercise[s] powers that are 'traditionally the exclusive prerogative of the state.'"  Id. at 224 (quoting Blum v. Yaretsky, 457 U.S. 991, 1005 (1982)); see also Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1929 n.1 (2019) ("[T]his Court has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity.").  The Fourth Circuit has also made clear that "the provision of medical services to prison inmates" fits that mold.  Conner, 42 F.3d at 224; see also West v. Atkins, 487 U.S. 42, 56 (1988) (stating that a state has a "constitutional duty to provide adequate medical treatment to those in its custody").  Accordingly, the Complaint has alleged

20

a sufficient factual basis to bring CCS within the purview of § 1983.[11]

Importantly, however, because the same standards that govern § 1983 liability of municipalities also govern § 1983 liability of private entities, Plaintiff must allege that CCS maintained an official policy or custom that caused the Decedent's

---

[11] The Court notes that prior decisions of other judges of this Court have held that "a private entity that functions as the medical department of a correctional facility is not a 'person' within the meaning of § 1983." Hill v. Hurst, No. 2:13cv287, 2017 WL 3449584, at *4 (E.D. Va. Feb. 13, 2017) (citing Newby v. Fasting, No. 1:01cv1432, 2002 WL 31962277, at *2 (E.D. Va. Mar. 27, 2002); Harden v. Green, 27 F. App'x 173, 178 (4th Cir. 2001) (unpublished per curiam)); accord Johnson v. Pierce, No. 2:14cv512, 2016 WL 8231164, at *3 (E.D. Va. Jan. 12, 2016); Caffee v. Con-Med Med., Co., No. 2:14cv623, 2015 WL 11112051, at *2 (E.D. Va. July 22, 2015). Other judges of this Court, however, have presumed that private medical contractors like CCS are susceptible to § 1983 liability. See, e.g., Costine v. Correct Care Sols., LLC, No. 2:19cv53, 2020 WL 2312440, at *12 (E.D. Va. May 8, 2020); Singleton v. Emran, No. 3:15cv200, 2017 WL 388821, at *7 (E.D. Va. Jan. 27, 2017). The Court follows the latter line of cases here as CCS appears to concede that, as a private medical contractor, it is subject to § 1983 liability, see ECF No. 43, at 17, a view that seems to prevail among federal courts, see, e.g., Winkler v. Madison County, 893 F.3d 877, 890 (6th Cir. 2018) ("A private entity . . . that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function."); Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 378-79 (7th Cir. 2017) (stating that the "availability of entity liability under section 1983" extends to "a private corporation that has contracted to provide essential government services," including medical services to inmates); Howell v. Evans, 922 F.2d 712, 723-24 (11th Cir. 1991) ("Generally, when the state contracts out its medical care of inmates, the obligations of the eighth amendment attach to the persons with whom the state contracts. Thus, [a private medical contractor] can be a person acting under color of state law for purposes of section 1983." (citation omitted)); Amin v. SCI-Phx. Med. Dep't, No. 20cv841, 2020 WL 3960432, at *3 (E.D. Penn. July 13, 2020) (distinguishing a state prison's medical department from a private medical contractor and finding that only the latter is a "person" under § 1983); Stevens v. Holler, No. 19cv3368, 2020 WL 3893245, at *8 (D. Md. July 10, 2020) ("Typically, § 1983 liability only applies to state actors. However, . . . § 1983 may apply to a private entity, if that entity operates under color of state law, such as here, where a private corporation serves as a prison health care provider."); Thomas v. N. Corr. Facility, No. 5:11cv7, 2012 WL 874246, at *5 (N.D.W. Va. Mar. 14, 2012) ("Under § 1983, a private corporation which contracts with the government to provide services can be held liable for constitutional violations.").

constitutional injury; liability premised on a theory of
respondeat superior is insufficient.   See Austin v. Paramount
Parks, Inc., 195 F.3d 715, 728 (4th Cir. 1999) (emphasis omitted);
Monell, 436 U.S. at 691.   According to the Fourth Circuit, an
official policy or custom can arise in four ways:

> (1) through an express policy, such as a written
> ordinance or regulation; (2) through the decisions of a
> person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers,
> that manifest[s] deliberate indifference to the rights
> of citizens; or (4) through a practice that is so
> persistent and widespread as to constitute a custom or
> usage with the force of law.

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in
original) (citation and internal quotation marks omitted) (quoting
Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

Here, the Complaint fails to plead that CCS maintained an
official policy or custom of providing constitutionally deficient
medical care to the inmates in its charge.   The Complaint does not
identify any express policy promulgated by CCS or a decision by a
CCS official with final policymaking authority that caused a
deprivation of the Decedent's constitutional rights; nor does it
properly allege such a deprivation through an omission[12] or a

---

[12] In asserting a claim against CCS for common law negligence, the Complaint
alleges that CCS "had a duty to train and supervise" its employees and to
"establish policies and procedure to be followed for the treatment,
supervision, and death monitoring of an inmate, such as the decedent,
suffering severe physical symptoms due to drug withdrawal," and that CCS
breached those duties.   ECF No. 2 ¶¶ 111-12.   Even regarding these broad
allegations as asserting the existence of an official policy (by omission),
such conclusory allegations fail to present well-pleaded facts that meet

practice that is so persistent and widespread as to constitute a custom with the force of law.[13]  Accordingly, the official capacity claims against the CCS nurses are **DISMISSED**.

## 2. Individual Capacity Claims

The law enforcement officials and the CCS nurses next argue that the Complaint fails to adequately plead facts supporting individual § 1983 liability for deliberate indifference in violation of the Eighth Amendment.  The Eighth Amendment protects those convicted of crimes from the infliction of cruel and unusual punishment.[14]  U.S. Const. amend. VIII; Wilson v. Seiter, 501 U.S. 294, 296-97 (1991).  This proscription of federal government conduct has been extended to the states by way of the Fourteenth

_____

the more rigorous deliberate indifference requirement of § 1983 liability. See Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."); Layman ex rel. Layman v. Alexander, 343 F. Supp. 2d 483, 489 (W.D.N.C. 2004) ("Mere negligence in the failure to train will not suffice to impose § 1983 liability.").

[13] The Complaint elsewhere alleges that CCS "had a history of failing to uphold minimal constitutional care standards for inmates." ECF No. 2 ¶ 84. This and related allegations, however, arise in the context of a § 1983 claim against Sheriff Watson, not the CCS nurses or CCS itself.  See id. ¶¶ 79-89.  Indeed, in those portions of the Complaint directed at the CCS nurses and CCS, there is no suggestion of Plaintiff alleging a CCS custom of providing constitutionally inadequate medical care.  Therefore, the Court declines to "read into the [C]omplaint allegations that are not squarely presented on [its] face."  Huffman v. Dish Network, L.L.C., No. 3:13cv13722, 2013 WL 12355014, at *12 (S.D.W. Va. Sept. 23, 2012).

[14] Although the Complaint expressly invokes the Eighth Amendment, it is unclear whether, at the time of these events, the Decedent was a convicted prisoner or a pretrial detainee.  If the latter, the Fourteenth Amendment's Due Process Clause would govern Plaintiff's claims.  See Hill v. Nicodemus, 979 F.2d 987, 990 (4th Cir. 1992).  In either case, however, the analysis would remain the same.  See Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001).  Thus, the Court proceeds as if Plaintiff's § 1983 claims are properly brought pursuant to the Eighth Amendment.

Amendment's Due Process Clause.    Wilson, 501 U.S. at 296.    In Estelle v. Gamble, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes [cruel and unusual punishment]" and is actionable under § 1983. 429 U.S. 97, 104-05 (1976); see also DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) ("Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated.").    To prevail on such a claim, a plaintiff must satisfy the two-pronged test set out in Farmer v. Brennan, 511 U.S. 825 (1994).    First, the plaintiff must demonstrate, objectively, the existence of a "serious medical need."    Farmer, 511 U.S. at 834 (quoting Estelle, 429 U.S. at 104).    Second, the plaintiff must prove that the official acted with "deliberate indifference."    Id.

With respect to the first prong, required proof consists of evidence that the medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."    Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)). Defendants do not seriously dispute this element, and the Court finds that the Complaint adequately pleads the existence of a serious medical need.  Indeed, Plaintiff alleges that upon arriving at PCJ for booking, the Decedent "presented with clear and obvious

signs that she was suffering from severe symptoms of heroin withdrawal," ECF No. 2 ¶ 12, and requested immediate medical treatment, id. ¶¶ 14, 20. Moreover, when viewed in the light most favorable to Plaintiff, the Complaint establishes that the Decedent's medical condition, borne out by visible physical manifestation and additional requests for treatment, persisted throughout the approximately thirty-six hours that the Decedent was incarcerated at PCJ before her death. See id. ¶¶ 13-15, 18-19, 21-27, 35. Taken as true, Plaintiff's allegations demonstrate a medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241. Moreover, several courts in this circuit have found that symptoms of heroin withdrawal can give rise to a serious medical need. See, e.g., Estate of Dellinger ex rel. Dellinger v. Bryant, No. 1:19cv44, 2020 WL 5249196, at *2 (D.S.C. Sept. 3, 2020) (adopting in part report and recommendation); Thornhill v. Aylor, No. 3:15cv24, 2016 WL 8737358, at *9 (W.D. Va. Feb. 19, 2016); Gonzalez v. Cecil County, 221 F. Supp. 2d 611, 616 (D. Md. 2002).

    To succeed on her claims, however, Plaintiff must also satisfy the second prong of Farmer: that each defendant acted with deliberate indifference in light of the Decedent's serious medical need. To make this showing, Plaintiff must ultimately prove that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. Critically,

this is a "higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) (citing <u>Estelle</u>, 429 U.S. at 106); <u>see also</u> <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016) (stating that "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances" (alteration in original) (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985))).  Instead, to constitute deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837; <u>see also</u> <u>id.</u> at 844 (indicating that officials are not liable if "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"). The Fourth Circuit has explained that a plaintiff can make this showing through direct evidence of the official's actual knowledge, <u>Scinto</u>, 841 F.3d at 226, as well as through "circumstantial evidence tending to establish such knowledge, including evidence 'that a prison official knew of a substantial risk from the very fact that the risk was obvious,'" <u>id.</u> (quoting <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2015)).  Bearing

26

this in mind, the Court considers the Complaint's allegations against the various defendants.

### a. Defendants Cashwell, Coardes, and Mayfield

Beginning with Defendants Cashwell, Coardes, and Mayfield, the Complaint alleges that these defendants: (1) were informed by the Decedent of her daily heroin use and her history of withdrawal symptoms; (2) observed the "obvious signs" that the Decedent was presently suffering from those symptoms; and (3) were asked to secure immediate medical assistance. ECF No. 2 ¶¶ 12, 14, 17-18, 20. Plaintiff alleges, however, that these defendants "ignored the information learned from . . . observing and speaking with the decedent," id. ¶ 13; accord id. ¶ 18, and placed the Decedent in the general jail population without providing her a medical examination and without "communicat[ing] to the deputies regarding monitoring the decedent's condition," id. ¶¶ 13-14, 16, 18-20. Taken as true, these allegations are sufficient to establish that Defendants Cashwell, Coardes, and Mayfield were deliberately indifferent to the Decedent's serious medical need. See Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986) (stating that an "inference of deliberate indifference" arises when prison guards are aware of an inmate's serious medical needs "but refrain[] from obtaining medical assistance").

In an effort to escape liability, Deputy Cashwell and Lieutenant Coardes cite Miltier v. Beorn, 896 F.2d 848 (4th Cir.

1990), for the proposition that non-medical officials "may rely on the opinion of the medical staff as to the proper course of treatment."[15] ECF No. 35, at 6-7 (citing Miltier, 896 F.2d at 854-55). They further point to Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), where the Third Circuit held that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands" and thus insulated from § 1983 liability. ECF No. 35, at 6 (quoting Spruill, 372 F.3d at 236). The cited authorities do not support dismissal here as the relevant allegations do not suggest that Cashwell and Coardes relied upon such a medical professional's judgment. It is true, as these defendants point out, that Nurse Murray noted "no current medical treatment needed" after examining the Decedent on August 22, 2017, but such examination occurred after the Decedent's intake interactions with Cashwell and Coardes. As such, those defendants may not rely on Nurse Murray's not-yet-existing examination notes in an effort to absolve themselves of liability for their pre-examination actions. See Spruill, 372 F.3d at 236 (finding dismissal of claims appropriate only "after the point at which [the inmate] was first under medical care").

---

[15] As recognized by another judge of this Court, Farmer overruled Miltier "to the extent that [Miltier] allowed a finding of deliberate indifference upon constructive knowledge." Brown v. Mitchell, 308 F. Supp. 2d 682, 708 n.30 (E.D. Va. 2004) (alteration in original). Consequently, Farmer does not undermine the proposition for which Cashwell and Coardes rely on Miltier.

Moreover, even if the Court were to assume that the Decedent was "under the care of [a] medical expert[]" by virtue of Nurse Mayfield's presence and/or participation at intake, Cashwell and Coardes still would not be shielded from liability.  As the Third Circuit noted in Spruill, a non-medical official's reliance on a medical professional's judgement in such circumstances is justifiable only "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."  Id. (emphases added).  As set out above, the Complaint alleges that during intake the Decedent: (1) informed Cashwell, Coardes, and Mayfield that she used heroin daily and had a history of withdrawal symptoms; (2) was exhibiting such symptoms at that time; and (3) requested immediate medical treatment. Viewed in the light most favorable to Plaintiff, these allegations establish that Cashwell and Coardes could not have reasonably believed that the Decedent was "in capable hands."   Indeed, accepting as true Plaintiff's allegation that it was obvious to the reasonable observer that, by looking at and/or listening to the Decedent, she was in immediate need of medical treatment, and further accepting as true Plaintiff's allegation that, despite that fact, Nurse Mayfield—a medical professional—failed to provide such treatment, it follows that Deputy Cashwell and Lieutenant Coardes were presented with "a reason to believe" that the Decedent was not receiving proper medical care.  In such circumstances, any

reliance on Nurse Mayfield's alleged judgment to not render treatment to the Decedent was unreasonable.

Nurse Mayfield defends, in part, on the ground that the Decedent "refused to consent to medical treatment," ECF No. 43, at 15, citing a form attached to her affidavit and signed by her and Coardes that states that the Decedent "refused medical processing," ECF No. 43-2, at 4. However, this form, which does not even appear to be signed by the Decedent, is not referenced in or attached to the Complaint, and Plaintiff disputes its authenticity (as she does with the exhibits submitted by the other nurses). See ECF No. 66, at 7-9. As such, the Court may consider this form only by converting the CCS Motion into a motion for summary judgment. See Fed. R. Civ. P. 12(d); Goines, 822 F.3d at 166. However, the Court declines to do so here. See Pegues v. Wal-Mart Stores, Inc., 63 F. Supp. 3d 539, 544 (D. Md. 2014) ("Whether to convert a motion to dismiss to a motion for summary judge is a matter of [the court's] complete discretion." (internal quotation marks omitted)); 5C Wright & Miller, Federal Practice and Procedure § 1366 (3d ed. Oct. 2020 update) ("As the language of the rule suggests, federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.").

The Complaint sufficiently alleges that Defendants Cashwell, Coardes, and Mayfield were deliberately indifferent to the Decedent's serious medical need. Accordingly, the Court **DENIES** the Cashwell Motion with respect to the § 1983 individual capacity claims against Deputy Cashwell and Lieutenant Coardes,[16] and **DENIES** the CCS Motion with respect to the § 1983 individual capacity claim against Nurse Mayfield.

### b. Defendant Murray

Next, Plaintiff alleges that Nurse Murray "examined and/or evaluated" the Decedent on August 22, 2017, the day after booking. ECF No. 2 ¶ 15. Nurse Murray documented that "no current medical treatment [was] needed," and in doing so, she completely ignor[ed] the information provided at booking that [the Decedent] had a serious opioid heroin addiction and that she continued to suffer from withdrawal symptoms." Id. These allegations are sufficient to permit the Court to find that the Complaint adequately pleads a claim of deliberate indifference against Nurse Murray. See Miltier, 896 F.2d at 853 ("Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference to those needs." (citing Sosebee, 797 F.2d at 182)).

In her affidavit, Murray claims that she never had contact with the Decedent, much less evaluated her, and had no knowledge

---

[16] The Complaint also alleges a separate § 1983 individual capacity claim against Coardes under a theory of supervisory liability, which the Court discusses below.

of the Decedent's medical condition.    ECF No. 43-3.    Again,
however, the Court declines to consider such extrinsic evidence at
this stage.    As such, the Court **DENIES** the CCS Motion with respect
to the § 1983 individual capacity claim against Nurse Murray.

### c. Defendant Kelly

The Court likewise finds that the Complaint contains adequate
facts supporting a claim of deliberate indifference on the part of
Sergeant Kelly.    As relevant to this defendant, Plaintiff alleges
that on the morning of August 23, 2017, the Decedent attempted
several times to gain the attention of jail officials and/or
medical staff from her cell to "receive lifesaving medical
treatment for her heroin withdrawal symptoms, which were then
worsening."    ECF No. 2 ¶¶ 23, 25, 27.    In one instance, Sergeant
Kelly looked into the Decedent's cell, "ignored all of [the]
decedent's attempts to gain [his] attention," and "offer[ed] no
assistance to the decedent at the time."    Id. ¶ 29.    Such factual
assertions give rise to a plausible inference of deliberate
indifference. See Sosebee, 797 F.2d at 182.    The Court, therefore,
**DENIES** the Cashwell Motion as it relates to the § 1983 individual
capacity claim against Sergeant Kelly.

### d. Defendants Deaver, Rose, Shaw, and Wilson

Whether the Complaint adequately states individual capacity
claims against the remaining on-duty guards, Deputies Deaver, Shaw
and Wilson, and Nurse Rose is a much closer question.    Although

the Complaint alleges that each of the other on-duty guards and CCS nurses performed or failed to perform some specific act or acts, displaying deliberate indifference toward the Decedent prior to her death, no such specific allegations exist with respect to Defendants Deaver, Rose, Shaw, or Wilson.[17]   Rather, such defendants fall within Plaintiff's broader allegations that each of the named defendants: (1) were on duty during the period of the Decedent's incarceration and came into contact with her at least once during that period; (2) knew by looking at and/or listening to the Decedent that she was in desperate need of medical treatment; and (3) deliberately ignored that fact by failing to take appropriate remedial action.   ECF No. 2 ¶¶ 4, 33, 35.

Although a close call, the Court cannot say at this time that these defendants are entitled to dismissal of these claims. Admittedly, the Complaint's allegations as to these defendants are thin.   Nonetheless, according to those allegations, which the Court must accept as true, <u>each</u> of these defendants came into contact with the Decedent at some point during her incarceration and learned by looking at or listening to the Decedent that she needed

---

[17] Although Plaintiff alleges that Defendants Deaver, Rose, and Wilson responded to the Decedent's cell to provide medical assistance on the morning of August 23, 2017, the Complaint specifically alleges that the Decedent had died before such defendants' arrival.  ECF No. 2 ¶¶ 32, 37.  Furthermore, there is no suggestion in the Complaint that any defendant, upon finding the Decedent unresponsive in her cell, rendered medical assistance to the Decedent in a deliberately indifferent or negligent manner.

immediate medical assistance.[18]  See Farmer, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Despite that thinly-alleged knowledge, the above-named defendants allegedly failed to provide medical assistance, raising an inference of deliberate indifference.  See Miltier, 896 F.2d at 853; Sosebee, 797 F.2d at 182.

It may be that the evidence produced at trial or at the summary judgment stage ultimately establishes that several, if not most, of the named defendants are not liable for the alleged constitutional deprivations.  At this stage, however, the Court's review is limited to the allegations appearing in the Complaint, and the Court concludes that those allegations are sufficient to state § 1983 deliberate indifference claims against Defendants Deaver, Rose, Shaw, and Wilson in their individual capacities, "even if doubtful in fact," Twombly, 550 U.S. at 555.  Accordingly, the Court **DENIES** the Cashwell Motion with respect to the § 1983 individual capacity claims against Deaver and Shaw; **DENIES** the Wilson Motion with respect to the § 1983 individual capacity claim against Wilson; and **DENIES** the CCS Motion with respect to the § 1983 individual capacity claim against Nurse Rose.

---

[18] As with Nurses Mayfield and Murray, the Court does not consider Nurse Rose's affidavit averring that he had no contact with the Decedent, or any knowledge of her condition, prior to attempting to resuscitate her.  ECF No. 43-4.

### e. Sheriff Watson
### (Respondeat Superior)

Plaintiff further seeks to hold Sheriff Watson liable in his individual capacity under a theory of respondeat superior. ECF No. 2 ¶¶ 8, 61. The Court need not devote much analysis to this claim as it is firmly established that § 1983 liability cannot be predicated on a theory of respondeat superior. See Iqbal, 556 U.S. at 676 ("Government officials may not be held liable [under § 1983] for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); Clark v. Md. Dep't of Pub. Safety & Corr. Servs., 316 F. App'x 279, 282 (4th Cir. 2009) (unpublished per curiam) (stating that "the principles of respondeat superior have no application to § 1983 claims"); Harbeck v. Smith, 814 F. Supp. 2d 608, 626 (E.D. Va. 2011) (same). Accordingly, Plaintiff's § 1983 claim against Sheriff Watson in his individual capacity under a theory of respondeat superior is **DISMISSED**.

### f. Sheriff Watson and Defendant Coardes
### (Supervisory Liability)

Finally, the Complaint is at least arguably subject to being interpreted as alleging § 1983 individual capacity claims against Sheriff Watson and Lieutenant Coardes in their roles as supervisors. Id. ¶¶ 8, 36. In certain circumstances, supervisory officials may be held individually liable under § 1983 for the constitutional injuries inflicted by their subordinates. Shaw, 13

35

F.3d at 798.   As the Supreme Court has observed, "the term 'supervisory liability' is a misnomer" as the supervisor is not called to "answer for the torts of [his or her subordinates]" but for "his or her own misconduct." Iqbal, 556 U.S. at 677.   Put differently, "[l]iability in this context is not premised on respondeat superior but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984) (citation omitted); see also Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987) ("[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." (emphasis added)).

The Fourth Circuit's decision in Shaw v. Stroud sets forth the three elements of supervisory liability.   First, the plaintiff must show that the supervisor defendant knew that "his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." Shaw, 13 F.3d at 799 (internal quotation marks omitted).   Second, the plaintiff must demonstrate that, in light of that knowledge, the supervisor's response "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive

practices." Id. Third, the plaintiff must establish an "affirmative causal link" between the supervisor's inadequate response and the alleged constitutional injury. Id.

In evaluating whether Plaintiff's allegations satisfy these three criteria, this Court is guided by the Fourth Circuit's helpful observations in Shaw. First, to qualify as "pervasive," a plaintiff must demonstrate that the challenged "conduct is widespread, or at least has [occurred] on several different occasions." Id. It is not sufficient, therefore, to "point[] to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence" or "guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." Id. (quoting Slakan, 737 F.2d at 373). Liability may attach, however, if the plaintiff demonstrates the supervisor's "continued inaction in the face of documented widespread abuses." Id. (quoting Slakan, 737 F.2d at 373).

Beginning with Lieutenant Coardes, the Complaint alleges that he "was in a supervisory role as the on-duty lieutenant" during the Decedent's incarceration. ECF No. 2 ¶ 36. As such, Coardes "ha[d] a duty to ensure that all of the deputies under his supervision were trained to properly identify and appropriately handle the medical conditions of incarcerated inmates." Id.

However, Plaintiff claims that he failed in those duties in light of the Decedent's death.  Id.  Even assuming such bare-bones allegations were intended to assert a § 1983 supervisory liability claim against Lieutenant Coardes, such allegations are clearly lacking.  Indeed, such allegations say nothing of Coardes' knowledge—actual or constructive—of his subordinates' alleged unconstitutional conduct.  Nor do they identify Coardes' response (or lack thereof) to such knowledge, much less that such response was woefully inadequate and/or caused the Decedent's injury.  Rather, Plaintiff's allegations, devoid of factual support, are simply "conclusory and not entitled to be assumed true." Iqbal, 556 U.S. at 681.  Accordingly, Plaintiff's § 1983 supervisory liability claim against Lieutenant Coardes, to the extent one is pleaded, is **DISMISSED**.

Turning to Sheriff Watson, the Court finds that any allegations intended to support a claim for supervisory liability against him are also insufficient.  Indeed, Plaintiff simply alleges (in the "Parties" section of the Complaint) that the Sheriff "had supervisory liability under . . . 42 U.S.C. § 1983 due to [his] supervisory indifference or tacit authorization of [his] subordinates' misconduct."  ECF No. 2 ¶ 8.  Yet the only § 1983 count in the Complaint as to Sheriff Watson, Count VI, advances "official policy or custom" liability, a theory of § 1983 liability entirely distinct from supervisory liability and, for

38

reasons already discussed, an unsuccessful one at that. Thus, notwithstanding the conclusory allegation early on in the Complaint that Sheriff Watson "ha[s] supervisory liability" under § 1983, it is unclear as to whether Plaintiff even intended to pursue such legal theory of liability. Such uncertainty is highlighted by the fact that the parties' briefs regarding Sheriff Watson's § 1983 liability includes <u>no</u> discussion of supervisory liability, instead focusing only on "official policy or custom" liability.[19] <u>See</u> ECF Nos. 35, at 9–11; 60, at 10–11. The motion to dismiss Count VI against Sherriff Watson in its entirety is therefore granted without the need for further analysis on this unargued theory of relief.

Alternatively, even viewing the allegations in Count VI for "official policy or custom" liability, the Court finds that such allegations fail to state a claim for supervisory liability. That count alleges that "[a]t all relevant times, Sheriff Watson had a non-delegable duty to oversee members of the Portsmouth Sheriff's Office and contractors working in the Portsmouth City Jail." <u>Id.</u> ¶ 81. The Complaint further alleges that "Sherriff Watson knew or should have known that contractor [CCS] had a history of failing to uphold minimal constitutional care standards for inmates." <u>Id.</u> ¶ 83. The Complaint then proceeds to identify five other

---

[19] Although Plaintiff's response sets forth the standard for supervisory liability (with no further seemingly related discussion), it appears in a section dealing with the <u>on-duty guards</u>. <u>See</u> ECF No. 60, at 7.

individuals that died while in the custody of various Virginia local jails that contracted with CCS for medical services, including PCJ, over an eight-year period (2008 to 2016).[20]  Id. ¶ 85. Such deaths, which Plaintiff attributes to CCS's failure to provide adequate medical treatment as well as its ignorance of serious medical symptoms, id. ¶ 85, are purportedly "just some of the many examples of Correct Care Solution's negligence and disregard of the inmates" under its charge, id. ¶ 86. Plaintiff also alleges that despite the Sheriff's asserted knowledge of such information, which the Complaint contends "was well known to law enforcement and correctional personnel through public dissemination of the problem's magnitude," id. ¶ 85, he "failed to implement any policies, training, and/or remedial measures to prevent continuing violations by Correct Care Solutions," id. ¶ 88.

Such allegations are almost entirely conclusory when viewed through the lens of a (non-argued) supervisory liability claim. Indeed, accepting as true the deaths of these other inmates, there are no facts suggesting that such prior deaths were caused through negligent medical care, and the only manner of connecting them to

---

[20] More specifically, the Complaint alleges that in 2008, an inmate of Norfolk City Jail died of a cerebral hemorrhage and an inmate of Alexandria City Adult Detention Center died of a brain hemorrhage; in 2014, an inmate of Richmond City Justice Center died of a perforated duodenal ulcer; in 2015, an inmate of Riverside Regional Jail in Prince George, Virginia, died of hypertensive cardiomyopathy; and in 2016, a PCJ inmate died of fibrinous pericarditis with pericardial effusion.  ECF No. 2 ¶ 85.

Sheriff Watson is through Plaintiff's bald assertions that Sheriff Watson must have knowledge of such prior events. Seeking to proceed on the theory that "these other inmates also died because CCS employees ignored them and Sheriff Watson knew about it" amounts to nothing more than speculation grounded in "naked assertion[s] devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Put simply, there are no plausible facts suggesting that such deaths, all but one of which occurred in jails outside Sheriff Watson's jurisdiction, resulted from negligence, let alone facts suggesting that: (1) Sheriff Watson knew that his subordinates were engaged in a "pervasive and unreasonable risk of constitutional injury to" the Decedent; (2) the Sherriff's response to such knowledge "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged" conduct; and/or (3) such "inaction" caused "the particular constitutional injury suffered" by the Decedent. Shaw, 13 F.3d at 799 (internal quotation marks omitted). While satisfying the Rule 8(a) standard is not an onerous task, more than legal conclusions and speculation are required to plausibly allege that Sheriff Watson's decision to hire CCS is itself grounds for supervisory liability. As such, to the extent the Complaint asserts a claim against the Sheriff under a theory of supervisory liability, such claim is **DISMISSED**.

### B. State Law Claims: Simple Negligence, Gross Negligence, and Willful and Wanton Negligence

Defendants also seek dismissal of Plaintiff's claims for negligence, gross negligence, and willful and wanton negligence pursuant to Virginia's Wrongful Death Act.[21]  To succeed on a negligence claim, a plaintiff must demonstrate "the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage."  <u>Atrium Unit Owners Ass'n v. King</u>, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003).  In Virginia,

> there are three levels of negligence.  The first level, simple negligence, involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another.  The second level, gross negligence, is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.  This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.

> The third level of negligent conduct is willful and wanton negligence.  This conduct is defined as acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

---

[21] Virginia's Wrongful Death Act provides a "right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death."  <u>Miller v. United States</u>, 932 F.2d 301, 303 (4th Cir. 1991) (citing Va. Code § 8.01-50); <u>accord</u> <u>Thornhill</u>, 2016 WL 8737358, at *12 ("The statute provides that whenever the death of a person is caused by 'the wrongful act, neglect, or default of any person or corporation' that person or corporation shall be liable for damages.").

Cowan v. Hospice Support Care, Inc., 268 Va. 482, 486-87, 603 S.E.2d 916, 918-19 (2004) (citations and internal quotation marks omitted).   A plaintiff that successfully demonstrates the third level of negligent conduct, willful and wanton negligence, may recover punitive damages.   See Huffman v. Love, 245 Va. 311, 314, 427 S.E.2d 357, 359 (1993) (citing Booth v. Robertson, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988)); see also Va. Code § 8.01-52.

In addition to recovery against negligent actors, pursuant to the doctrine of respondeat superior, a plaintiff may also recover damages against one's employer "for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment." Kensington Assocs. v. West, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987). Importantly, such liability may also attach to Virginia sheriffs with respect to the tortious conduct of his or her deputies.   See Lloyd, 2015 WL 1288346, at *12 & n.14 ("It has long been established in Virginia that a sheriff 'shall answer civilly for all the acts of his deputy.'" (quoting Verry v. Barry, 71 Va. Cir. 318, 2006 WL 2578368, at *1 (Fairfax Cnty. 2006)).

Here, Plaintiff's negligence, gross negligence, and willful and wanton negligence claims against the on-duty guards and the CCS nurses are premised on the same conduct that underly her § 1983 deliberate indifference claims: despite outward manifestation of heroin withdrawal symptoms and the Decedent's repeated requests

for immediate medical assistance, Defendants failed to take appropriate action, proximately causing the Decedent's death. ECF No. 2 ¶¶ 42-57, 90-102, 121-26. Plaintiff also seeks to hold Sheriff Watson and CCS liable for the alleged negligent conduct of their respective subordinates under a theory of <u>respondeat superior</u>. <u>Id.</u> ¶¶ 8-9, 64-78, 108-20.

### 1. Sheriff Watson and the On-Duty Guards

Sheriff Watson and the on-duty guards argue that Plaintiff's simple negligence claims are barred by state sovereign immunity.[22] In Virginia, individuals that work for an immune government entity, such as a sheriff's office, may invoke the Commonwealth's sovereign immunity with respect to claims of simple negligence so long as the challenged conduct consisted of "acts of judgment and discretion which are necessary to the performance of [essential] governmental function[s]." <u>Heider v. Clemons</u>, 241 Va. 143, 145, 400 S.E.2d 190, 191 (1991); <u>accord</u> <u>Pike v. Hagaman</u>, 292 Va. 209, 214, 787 S.E.2d 89, 92 (2016) (stating that state sovereign immunity is necessary to "protect[] the state from burdensome

---

[22] As the Fourth Circuit has explained, Eleventh Amendment immunity and state sovereign immunity are "related but not identical concepts." <u>Stewart v. North Carolina</u>, 393 F.3d 484, 487 (4th Cir. 2005); <u>accord</u> <u>Murphy v. Smith</u>, 844 F.3d 653, 656 (7th Cir. 2016); <u>Beaulieu v. Vermont</u>, 807 F.3d 478, 485-86 (2d Cir. 2015); <u>see also</u> <u>Fed. Mar. Comm'n v. S.C. State Ports Auth.</u>, 535 U.S. 743, 753 (2002) ("[T]he Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity."); <u>Alden v. Maine</u>, 527 U.S. 706, 713 (1999) ("[T]he sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.").

interference with the performance of its governmental functions");
see also First Va. Bank-Colonial v. Baker, 225 Va. 72, 79, 301
S.E.2d 8, 12 (1983) ("[G]overnment can function only through its
servants, and certain of those servants must enjoy the same
immunity in the performance of their discretionary duties as the
government enjoys."). If, however, the alleged negligence stems
from the performance of "purely ministerial acts," the immunity
defense is unavailable.[23] Heider, 241 Va. at 145, 400 S.E.2d at
191 (quoting Wynn v. Gandy, 170 Va. 590, 595, 197 S.E. 527, 529
(1938)); accord Pike, 292 Va. at 217, 787 S.E.2d at 93.

The Virginia Supreme Court has outlined four factors for
courts to consider in assessing whether the challenged conduct
constitutes an essential government function involving the use of
judgment and discretion or, conversely, a ministerial obligation:
"(1) the function performed by the employee, (2) the extent of the
state's interest and involvement in that function, (3) the degree
of control and direction the state exercises over the employee,
and (4) whether the act performed involves the use of judgment and
discretion." Friday-Spivey v. Collier, 268 Va. 384, 387-88, 388

_____

[23] A ministerial act is one "performed without the independent exercise of
discretion or judgment." Act, Black's Law Dictionary (11th ed. 2019); see
also Richlands Med. Ass'n v. Commonwealth ex rel. State Health Comm'r, 230
Va. 384, 386, 337 S.E.2d 737, 739 (1985) ("A ministerial act is one which
a person performs in a given state of facts and prescribed manner in
obedience to the mandate of legal authority without regard to, or the
exercise of, his own judgment upon the propriety of the act being done."
(internal quotation marks omitted)).

n.4, 601 S.E.2d 591, 593 & n.4 (2004) (citing <u>James v. Jane</u>, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980)); <u>accord</u> <u>Messina v. Burden</u>, 228 Va. 301, 313, 312 S.E.2d 657, 663 (1984).  The dispute here, as is often the case, turns on the fourth factor—whether the challenged acts involved the use of judgment and discretion.[24] <u>See, e.g.</u> <u>Friday-Spivey</u>, 268 Va. at 388, 601 S.E.2d at 593; <u>Whitley v. Commonwealth</u>, 260 Va. 482, 493, 538 S.E.2d 296, 302 (2000); <u>see also</u> <u>Adams v. NaphCare, Inc.</u>, 243 F. Supp. 3d 707, 718 (E.D. Va. 2017) (stating that "the factor regarding discretion, to the exclusion of other factors, has carried the entire weight of negative sovereign immunity rulings"); <u>Dowdy v. Pamunkey Reg'l Jail Auth.</u>, No. 3:14cv3, 2014 WL 2002227, at *4 (E.D. Va. May 15, 2014) (observing that the judgment-and-discretion factor is "typically dispositive").

According to Sheriff Watson and the on-duty guards, "the deputies' decisions here regarding [the Decedent's] purported medical needs and if/when to contact medical personnel inherently involved judgment and discretion." ECF No. 35, at 14; <u>accord</u> ECF No. 50, at 13.  In support of this claim, these defendants primarily rely on <u>Estate of Harvey ex rel. Dent v. Roanoke City</u>

---

[24] Plaintiff does not appear to contest that the other factors weigh in favor of a finding of sovereign immunity.  <u>See</u> <u>Myrick v. NaphCare, Inc.</u>, No. 3:16cv952, 2017 WL 3234384, at *2 (E.D. Va. July 31, 2017) (finding that supervising inmates "falls cleanly within the governmental function of housing inmates and properly operating jails" and that the state has a "great interest in and control over this function").

Sheriff's Office, 585 F. Supp. 2d 844 (W.D. Va. 2008); <u>Dowdy v.</u>
<u>Pamunkey Regional Jail Authority</u>, 2014 WL 2002227; and <u>Lloyd v.</u>
<u>Morgan</u>, 2015 WL 1288346.

In the first of these cases, a Virginia sheriff and her
deputies sought summary judgment on a complaint alleging
negligence in connection with a pretrial detainee's death,
claiming sovereign immunity.  <u>Dent</u>, 585 F. Supp. 2d at 847, 863-
64.  Upon being booked into a city jail, the decedent "became wild
and hostile."  <u>Id.</u> at 847.  According to the jail officials, the
decedent, who had previously been arrested on several occasions,
"often entered the jail acting in a similar manner," but he usually
calmed down and became manageable "[a]fter a few days."  <u>Id.</u>  The
decedent's disorderly and combative conduct persisted over the
next few days, to include throwing feces and urine out of his cell
at the deputies and kitchen workers; charging at, kicking, and
biting the deputies when they attempted to clean his cell; and
refusing to wear clothes.  <u>Id.</u> at 847-48.  Believing him to be
suffering from drug withdrawal, the deputies informed the medical
department of the decedent's wild behavior.  <u>Id.</u> at 849-50.  After
receiving additional information from the decedent's sister
regarding the decedent's medical condition, the medical department
called 911 to have the decedent transported to the emergency room.
<u>Id.</u> at 849-50.  However, because medical department staff described
the decedent's condition as "not a dire emergency insofar as he

47

was not unconscious or not breathing," only "a basic life support unit" was dispatched rather than "an advanced life support unit." Id. at 850.  The deputies' efforts to remove the decedent from his cell and transport him to the emergency room were met with continued combative efforts, including spitting on and attempting to bite jail officials.  Id.  The deputies, therefore, placed a blanket over the decedent's head and restrained him to a stretcher. Id.  With the blanket still over his head, the decedent continued to struggle and scream in the ambulance until reaching the emergency room, at which point an emergency room nurse replaced the blanket with a surgical mask.  Id. at 851.  Moments later, however, the decedent went into cardiac arrest and died two days later.  Id.  In granting summary judgment in favor of the deputies, the court held that the evidence established as a matter of law that "the deputies were engaged in an essential governmental function involving the exercise of discretion and judgment at all times relevant to the complaint."  Id. at 864.

In Dowdy, the plaintiff alleged that Virginia regional jail officials acted negligently in their assessment and placement within the jail of an inmate with known suicidal intent.  2014 WL 2002227, at *1-2.  More specifically, upon delivering the inmate to the jail, deputy sheriffs informed jail officials that the inmate "wanted to kill himself," providing jail officials with a suicide note authored by the inmate.  Id. at *1.  Despite that

48

knowledge, the inmate received no medical or psychological treatment and was placed in a standard jail cell rather than a cell in the infirmary that was "specifically designed for suicide watch." Id. at *2. Four days later, the inmate hanged himself using his bedsheets. Id. The jail officials moved to dismiss the negligence claims on the basis of sovereign immunity. Id. at *1. The court granted the motion to dismiss, explaining,

> The Amended Complaint alleges that the [jail authority] vested its officers with the authority to assess the physical and mental health of arriving inmates, screen for "dysfunctional" behaviors, personally interview each arriving individual, and make prison housing decisions and assignments based on the officers' subjective determinations as to each inmate's physical and psychological needs and abilities. In short, the [jail authority] required officers to exercise judgment and discretion in receiving, classifying, and placing incoming inmates. The defendants' actions "were discretionary in nature," entitling those officers to sovereign immunity.

Id. at *4.

Finally, in Lloyd, the plaintiff sought to hold a Virginia sheriff liable for an injury stemming from the alleged negligent conduct of two of his deputies. 2015 WL 1288346, at *3. While being escorted by the two deputies from court to a detention facility, the plaintiff, handcuffed and shackled, slipped and fell down a flight of stairs. Id. The deputies took the plaintiff to an emergency room, where an attending physician ordered certain tests be conducted. Id. However, one of the deputies cancelled the tests and transported the plaintiff to the detention facility.

Id.  Upon release from custody shortly thereafter, the plaintiff
sought medical attention at a hospital and was informed that "she
had suffered serious head and bodily injuries from her fall and
that she required additional treatment from her injuries."  Id.
The sheriff moved to dismiss the simple negligence claim, arguing
that it was barred by sovereign immunity.  Id. at *11.  The
undersigned judge granted the motion on that basis, agreeing with
the magistrate judge's conclusion that the relevant conduct—the
manner of escorting the plaintiff and the extent of treatment
permitted at the emergency room—was "replete with decisions . . .
made based on judgment and discretion."  Id. at *14.

    According to Sheriff Watson and the on-duty guards, these
cases establish that they are entitled to sovereign immunity with
respect to the simple negligence claims alleged here.  Plaintiff,
on the other hand, claims that the challenged conduct in this case
did not involve the use of judgment and discretion, pointing to
Jennings v. Hart, 602 F. Supp. 2d 754 (W.D. Va. 2009), and Adams
v. NaphCare, Inc., 243 F. Supp. 3d 707.  In Jennings, a Virginia
county jail inmate submitted written requests to see a doctor after
experiencing painful headaches over a two-week period.  602 F.
Supp. 2d at 756.  A nurse practitioner ordered lab work, prescribed
medication, and referred the inmate to a neurologist for further
evaluation, but the sheriff's office failed to schedule an
appointment with a neurologist.  Id.  Over the next several days,

50

the inmate's headaches persisted, despite taking the prescribed medication. Id. at 757. The inmate informed jail officials of the worsening symptoms and requested that she be taken to a hospital, but jail officials ignored her. Id. Finally, nine hours after a deputy reported that the inmate was very sick, vomiting, and suffering from cold sweats and a headache, jail officials called for an ambulance. Id. An MRI and CT scan later revealed a lesion in the inmate's brain, and further analysis indicated that she had suffered a stroke. Id. She died days later after being removed from life support. Id. Her estate filed suit against the sheriff and several deputies, alleging negligence. Id. at 758. The defendants moved to dismiss on the ground of sovereign immunity, arguing, in part, that "the provision of medical care to [the decedent] involved the exercise of judgment and discretion." Id. The court, however, rejected the affirmative defense, reasoning that although "the provision of medical care . . . initially involved the exercise of some judgment and discretion," the circumstances of that particular case dictated a finding of no sovereign immunity. Id. at 758. The court elaborated,

> In this case, the Defendants allegedly ignored Jennings' worsening physical condition and repeated requests for help for a period of ten days after Peach, a trained nurse practitioner, referred Jennings to a neurologist. According to the Complaint, the Defendants essentially made no efforts whatsoever to even contact a neurologist or another doctor to schedule an appointment on

51

> Jennings' behalf. By the time the Defendants actually
> contacted outside medical professionals, Jennings was
> suffering from brain abscesses and a stroke. Thus,
> according to the allegations in the Complaint, well
> before Jennings was taken to the hospital, the
> circumstances were such that <u>the Defendants lacked the
> discretion to keep her at the jail and deny her the
> opportunity to be seen by a neurologist or other medical
> professional</u>.

<u>Id.</u> at 759 (emphasis added).

Similarly, in <u>Adams</u>, the estate of a pretrial detainee that died in a Virginia regional jail alleged, among other things, that jail officials regularly denied the decedent food and water over a period of several months before his death. 243 F. Supp. 3d at 709, 713. The defendants sought to dismiss the plaintiff's simple negligence claims on the ground of sovereign immunity. <u>Id.</u> at 719. As in <u>Jennings</u>, a judge of this Court denied the motion to dismiss, finding the immunity defense inapplicable at the Rule 12(b)(6) stage based on the resolution of the judgment-and-discretion factor. The Court began by observing that the relevant frame of reference regarding the use of judgment and discretion is "<u>the act complained of</u>," not the everyday duties ordinarily performed by the government employee. <u>Id.</u> (quoting <u>Messina</u>, 228 Va. at 313, 321 S.E.2d at 663). Accordingly, the Court focused its attention on the alleged conduct giving rise to the simple negligence claims: depriving the decedent of food and water. <u>Id.</u> at 720 ("[W]hile the Correctional Officer Defendants may have discretion in their jobs overall, they are not alleged to be liable

for acts or omissions involving such a general level of discretion.").  In the Court's view, "deciding whether to let a pretrial detainee under one's care thirst and starve to death over the course of several months, in appallingly unsanitary conditions, does not require the exercise of much, if any, discretion or judgment." Id.  Indeed, the purpose of sovereign immunity, the Court explained, is to provide protection to state employees engaged in conduct involving "special risks arising from . . . governmental activity, or the exercise of judgment or discretion about the proper means of effectuating the governmental purpose of the . . . employer." Id. at 721 (second alteration in original) (quoting Heider, 241 Va. at 145, 400 S.E.2d at 191).  Although providing food and water to inmates is essential to the "governmental purpose of maintaining custody of an accused individual pending adjudication, performing that function does not entail any 'special risk' requiring the exercise of judgment and discretion." Id. at 721-22.  Rather, such duty is more appropriately characterized as a ministerial one. Id. at 722.

Importantly, in arriving at this conclusion, the Court distinguished Dowdy, noting that the facts alleged in that case clearly demonstrated that the relevant acts involved the use of judgment and discretion. Id. at 721 ("The conduct [in Dowdy] required a significant level of judgment, as the officers and the medical examiner had to weigh the likelihood that the inmate would

53

act upon his stated desire to commit suicide. Moreover, the defendants were specifically vested with 'the authority to assess the physical and mental health of arriving inmates, screen for "dysfunctional" behaviors, personally interview each individual, and make prison housing decisions and assignments based on [their] subjective determinations.' By contrast, the Correctional Officer Defendants here, at least for the acts or omissions giving rise to the claims of negligence, were not allegedly facing any such complex situation that required the use of judgment and discretion."); see also Dowdy, 2014 WL 2002227, at *4 (stating that the question of whether and to what extent the jail officials' actions involved judgment and discretion "can be resolved by perusing the substance of the allegations themselves").

The Court finds persuasive the thorough and well-reasoned decisions in Jennings and Adams and, applying such reasoning to the instant case, concludes that Sheriff Watson and the on-duty guards may not successfully invoke the defense of sovereign immunity at the Rule 12(b)(6) stage with respect to Plaintiff's simple negligence claims. To begin, this Court is well aware, as the Sheriff and his deputies point out and as multiple other courts have recognized, that the operation of a jail, including the provision of medical care, is squarely a governmental function and undoubtedly requires jail officials, such as the on-duty guards, to make frequent judgment calls in carrying out their duties in

54

that capacity.  See, e.g., Myrick, 2017 WL 3234384, at *2; Bourne v. Sw. Va. Reg'l Jail, No. 7:14cv140, 2014 WL 2930053, at *3 (W.D. Va. June 27, 2014).  But as recognized in Adams, the Court must look to the act complained of, not the general duties ordinarily performed, in evaluating the degree to which the government employee exercised judgment and discretion.  Adams, 243 F. Supp. 3d at 719; accord Heider, 241 Va. at 145, 400 S.E.2d at 191 (stating that courts "must assess whether the act to which liability is asserted involved the exercise of judgment and discretion").  And in doing so at the Rule 12(b)(6) stage, the Court is necessarily confined to the allegations in the Complaint.

Here, Plaintiff alleges that the Decedent not only informed jail officials and medical staff during intake that she used heroin daily and had a history of withdrawal symptoms, but also that the Decedent was then physically exhibiting such symptoms to such an extent that it was obvious that she required immediate medical treatment, as the Decedent then requested.  The Decedent's requests were ignored, and she was placed in the general population without any close observation.  If the allegations stopped there, the case for sovereign immunity might be on stronger footing.  Cf. Dowdy, 2014 WL 2002227, at *4 (stating that the decision to place a suicidal inmate in a standard cell rather than in a cell specifically designed for suicidal inmates involved judgment and discretion).  As it is, the Complaint goes on to allege that over

the next day and a half, the Decedent's physically obvious symptoms progressed; and in the final hours of her life, the Decedent can be seen in her cell repeatedly beckoning for assistance to no avail, even as multiple guards passed by her cell.  On these alleged facts, the on-duty guards were not confronted with any "special risk" requiring the exercise of judgment and discretion. Rather, they were allegedly faced with the decision of whether to provide _any_ medical assistance to an inmate who had repeatedly requested it and was in obvious need thereof.  See Adams, 243 F. Supp. 3d at 721-22; Jennings, 602 F. Supp. 2d at 759.  Stated differently, the question is not what was the proper course of treatment, which is clearly a discretionary choice, but rather whether to provide her even the most basic level of medical care while she was in obvious distress.  See Jennings, 602 F. Supp. 2d at 759.  This is in critical contrast to the cases relied upon by Sheriff Watson and the on-duty guards, where the discretionary nature of the challenged conduct was clearly evident from the allegations themselves.  See Lloyd, 2015 WL 1288346, at *14 (noting that the challenged conduct was "replete with decisions to be made based on judgment and discretion"); Dowdy, 2014 WL 2002227, at *4 (stating that the complaint's allegations clearly demonstrated that the defendants were required "to exercise judgment and discretion in receiving, classifying, and placing incoming inmates"); Dent, 585 F. Supp. 2d at 864 (finding that the evidence

established that "the deputies were engaged in an essential government function involving the exercise of discretion and judgment <u>at all times relevant to the complaint</u>" (emphasis added)).

Moreover, Sheriff Watson and the on-duty guards' efforts to distinguish <u>Jennings</u> and <u>Adams</u> are unconvincing. According to these defendants, the facts presented in those cases were "extreme in terms of deputies' disregarding [of] inmates' medical needs for weeks and months," rendering the allegations in the instant case "far afield" from those in <u>Jennings</u> and <u>Adams</u>. ECF No. 61, at 5; <u>see</u> ECF No. 70, at 3-4. In the Court's view, however, that it took less time for the Decedent to succumb to her condition than the decedents in <u>Jennings</u> and <u>Adams</u> does not immunize Sheriff Watson and the on-duty guards against liability for the otherwise non-discretionary negligent conduct alleged in this case.

For the foregoing reasons, the Complaint plausibly alleges that the on-duty guards "lacked judgment and discretion in their conduct related to . . . Plaintiff's claims of negligence against them, and, therefore, they fail to satisfy the <u>James</u> factor regarding discretion." <u>Adams</u>, 243 F. Supp. 3d at 722. Consistent with <u>Adams</u>, this factor is dispositive of the issue—Sheriff Watson and the on-duty guards may not claim the protection of sovereign

immunity with regard to Plaintiff's simple negligence claims.[25] Accordingly, the Court **DENIES** the Cashwell Motion and the Wilson Motion as to those claims.[26]

Regardless of the availability of sovereign immunity with respect to claims of simple negligence, such protection "is not available to a defendant whose culpability extends beyond mere negligence." McLenagan v. Karnes, 27 F.3d 1002, 1008 n.10 (4th Cir. 1994); accord James, 221 Va. at 53, 282 S.E.2d at 869 ("A state employee who acts wantonly, or in a culpable or grossly negligent manner, is not protected."). Accordingly, Sheriff Watson and the on-duty guards are not entitled to dismissal of the gross negligence and/or wanton and willful negligence claims if the Complaint contains sufficient facts that would permit a factfinder to reasonably conclude that the alleged conduct "extends beyond mere negligence." McLenagan, 27 F.3d at 1008 n.10.

---

[25] The Court further notes that even if Sheriff Watson and the on-duty guards are entitled to sovereign immunity with respect to the simple negligence claims, the benefits of that protection (immunity from not just liability, but from suit) would not be fully realized given, as further discussed herein, the Complaint sufficiently alleges claims of gross negligence and willful and wanton negligence based on the same facts.

[26] The Court further notes that the on-duty guards do not contend that the allegations otherwise fail to state a claim for simple negligence, nor does Sheriff Watson otherwise argue against the application of the doctrine of respondeat superior. On that note, the Court finds that any liability as to the Sheriff regarding Plaintiff's negligence claims is based solely on respondeat superior liability. Indeed, Virginia does not recognize a cause of action for negligent supervision, see C.H. ex rel. A.H. v. Church of God in Christ, Inc., 297 Va. 604, 630, 831 S.E.2d 460, 475 (2019), and the Complaint contains no facts even suggesting that the Sheriff's own negligence contributed to the Decedent's injury—that is, that the Sheriff was personally involved in or even knew about the specific conduct alleged in this case.

As explained more fully above in the context of Plaintiff's § 1983 deliberate indifference claims, the Court finds such to be the case here.  Indeed, Plaintiff's allegations, if true, suggest not just "an utter disregard of prudence that amounts to a complete neglect of" the Decedent's safety (gross negligence), Cowan, 268 Va. at 487, 603 S.E.2d at 918, but also "reckless indifference to the consequences, with the defendant[s] aware, from [their] knowledge of existing circumstances and conditions, that [their] conduct probably would cause injury to" the Decedent (willful and wanton negligence), id.  Thus, the Court **DENIES** the Cashwell Motion and Wilson Motion as to the gross negligence and willful and wanton negligence claims against the on-duty guards as well as against Sheriff Watson under the doctrine of respondeat superior.[27]

## 2. The CCS Defendants

For essentially the same reasons analyzed above with respect to the allegations against Sheriff Watson and the on-duty guards,

---

[27] As previously discussed, a plaintiff may seek punitive damages where the allegations support a claim of willful and wanton negligence. Huffman, 245 Va. at 314, 427 S.E.2d at 359.  As such, Plaintiff's claims for punitive damages as to the on-duty guards are appropriate.  Importantly, however, in Virginia, recovery of punitive damages against an employer-defendant pursuant to the doctrine of respondeat superior is permitted only where such defendant authorized or ratified the negligent conduct of his or her employee. Blakely v. Austin-Weston Ctr. for Cosm. Surgery L.L.C., 348 F. Supp. 2d 673, 680 (E.D. Va. 2004).  Because the Complaint in this case fails to plead facts that plausibly allege that Sheriff Watson "authorized" or "ratified," or even knew about, the specific conduct of his subordinates regarding the Decedent, punitive damages may not be awarded against Sheriff Watson. See id. ("[W]hile plaintiff broadly alleges in the complaint that [the employer-defendant] ratified, accepted, or condoned [its employee's] actions, plaintiff neither alleges nor offers proof of any facts to support [those] claim[s]." (footnote omitted)).

the Court finds that the allegations in the Complaint regarding Plaintiff's § 1983 deliberate indifference claims against the CCS nurses also sufficiently state claims for negligence, gross negligence, and willful and wanton negligence against the CCS nurses, and against CCS under a theory a <u>respondeat</u> <u>superior</u>.[28] Accordingly, the Court **DENIES** the CCS Motion with respect to such claims.

## C. <u>Ad Damnum</u> Clause

Lastly, Defendants contend that Plaintiff's demands of $5,000,000 in compensatory damages and $10,000,000 in punitive damages[29] exceeds that permitted by Virginia law.[30]  ECF Nos. 35, at 17-18 (citing Va. Code §§ 2.2-1839, 8.01-581.15); 43, at 18-19 (citing Va. Code § 8.01-581.15).  The Court agrees with Plaintiff, however, that such arguments are premature at the Rule 12(b)(6) stage.  <u>See</u> ECF Nos. 60, at 16; 66, at 10; <u>Etheridge v. Med. Ctr.</u>

---

[28] As with Sheriff Watson and the on-duty guards, although these allegations support a claim of punitive damages against the CCS nurses, because the Complaint does not plead facts that plausibly allege that CCS authorized or ratified the CCS nurses' alleged negligent conduct in this case, punitive damages may not be awarded against CCS.  <u>See</u> <u>Blakely</u>, 348 F. Supp. 2d at 680.

[29] As previously indicated, Plaintiff's demand for punitive damages arises solely under Virginia law.  ECF No. 2 ¶ 126.

[30] While the on-duty guards merely assert that Plaintiff's damages demands are impermissible, the CCS Defendants move to strike the <u>ad</u> <u>damnum</u> clause pursuant to Federal Rule of Civil Procedure 12(f).  ECF No. 43, at 19 (citing <u>Paul v. Gomez</u>, 190 F.R.D. 402, 403 (W.D. Va. 2000)).  Rule 12(f) provides that a federal court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

Hosps., 237 Va. 87, 96, 376 S.E.2d 525, 529 (1989) ("The limitation
on medical malpractice recoveries contained in [Virginia] Code
§ 8.01-581.15 does nothing more than establish the outer limits of
a remedy provided by the General Assembly.  A remedy is a matter
of law, not a matter of fact.  A trial court applies the remedy's
limitation only after the jury has fulfilled its fact-finding
function." (citations omitted)); Fid. Nat'l Title Ins. Co. v. Wash.
Settlement Grp., LLC, 87 Va. Cir. 77, 2013 WL 9541969, at *15
(Fairfax Cnty. 2013) (noting, with regard to Virginia cap on
punitive damages, that "by the clear language of the statute, the
cap pertains to the amount of punitive damages that may [be]
recovered by a successful party, not the amount that may be sought
in the complaint and to which a jury may find a defendant liable"
(emphases added)); Bennett v. Riverside Reg'l Med. Ctr., 43 Va.
Cir. 13, 1997 WL 1070546, at *1 (Newport News 1997) (finding the
defendant's arguments in support of a motion to reduce the demand
in the ad damnum clause "not persuasive given the court's
obligation to reduce any verdict above the statutory cap"); Va.
Code § 2.2-1839(B) (instructing courts to reduce jury award
against sheriffs and deputies in their individual capacities by
the amount "in excess of the approved maximum coverage amount as
established by the [Virginia Department of Treasury's Risk
Management Division]").  Accordingly, to the extent Defendants'

61

motions request the Court to strike or reduce Plaintiff's requested damages, the Court **DENIES** such request at this time.[31]

### IV. CONCLUSION

For the reasons stated above, each of the three Motions to Dismiss is **GRANTED IN PART AND DENIED IN PART**. ECF Nos. 34, 42, 49. The § 1983 official capacity claims against Sheriff Watson, the on-duty guards, and the CCS nurses are **DISMISSED**.[32] The § 1983 individual capacity claims against the on-duty guards and the CCS nurses may proceed, and the Cashwell Motion, CCS Motion, and Wilson Motion are **DENIED** as to those claims. The § 1983 claim against Sheriff Watson premised on the doctrine of <u>respondeat superior</u> is **DISMISSED.** The § 1983 supervisory liability claims against Defendant Coardes and Sheriff Watson are **DISMISSED.** The Cashwell Motion, CCS Motion, and Wilson Motion are also **DENIED** with respect to Plaintiff's various negligence claims. Finally, Defendants' motions are **DENIED** to the extent Defendants seek to strike or reduce Plaintiff's damages demands in the <u>ad damnum</u> clause.

---

[31] Indeed, Defendants, the moving parties, have not demonstrated any prejudice stemming from Plaintiff's damages demands, nor have they offered any other persuasive arguments as to why the Court is obligated to confront this issue at this early stage.

[32] As set out above, this includes the "official policy or custom" claim against Sheriff Watson.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/ Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November __25__, 2020